THE STATE OF OHIO, APPELLEE, *v.* BATES, APPELLANT.

(No. 76-904—Decided December 23, 1976.)

*Mr. Simon L. Leis, Jr.,* prosecuting attorney, *Mr. Robert R. Hastings, Jr.,* and *Mr. Thomas P. Longano,* for appellee.

*Latimer & Swing Co., L. P. A., Mr. Albert J. Mestemaker, Messrs. Schwartz & Schwartz* and *Mr. Michael S. Schwartz,* for appellant.

*Per Curiam.*

## I.

The record before us establishes the following facts:

On November 25, 1974, the defendant-appellant, Leroy Bates, was living at his sister's residence located at 2248 Wheeler Street, in Cincinnati. Ellis Shelton, a friend of Leroy Bates for about six years, stopped by the Wheeler Street address to see Bates that afternoon.

Shelton explained to Bates that he was planning an armed robbery of the Warner Tavern and that it would be necessary for him to have a gun. Shelton also informed Bates that when he pulled the robbery off he would have the gun with him; that he would have ammunition for the gun; and that it would be loaded.

Shelton asked Bates if he knew of anyone who had a gun and, if so, could he obtain it. Bates told Shelton that he knew of an individual who had guns and that he could get a gun for Shelton. He then telephoned a friend by the name of Kenneth Carter. From past experience he knew that Carter had access to firearms. Bates asked Carter to loan him a gun, but Carter refused and said that he was willing to sell him one for $20. Bates agreed to this purchase price.

During their discussion, Shelton told Bates that he would need help and assistance in executing the robbery. When asked if he would assist Shelton in the robbery, Bates agreed.

Later that day, in the early evening, Kenneth Carter arrived at the Wheeler Street address carrying a sawed-off, 12-gauge shotgun. Shelton met Carter on the street in front of Bates' sister's home where Carter handed the

gun to Shelton, who, in turn, handed $13 to Carter. The balance of $7 was to be paid to Carter at a later time. Shelton was also given three or four shotgun shells with number 5 or 6 size shot.

Shelton departed after the transaction with Carter and subsequently returned in the late evening hours of the same day. Shelton and Bates then left the Wheeler Street address together and headed for a wooded hillside known as "TV Hill," located in the Wheeler Street area, the property of WCET television studios.

When the two men arrived at the hill, Shelton removed the unassembled shotgun from a bag. The weapon, in three pieces, was then assembled by Shelton. Appellant observed Shelton assembling the weapon and also saw that Shelton was in possession of several shotgun shells for the weapon. Both men then put stocking masks over their heads before they proceeded to the bar. Bates' role in the robbery was to go behind the bar and take the money while Shelton held the shotgun on the patrons. The expected take in the robbery was to be about $200.

They departed "TV Hill" together, headed for the Warner Tavern located at 303 Warner Street. Upon their arrival both men looked into the tavern and observed three people sitting in the bar.

Bates and Shelton then entered the tavern with the former leading the way. The time was approximately midnight or shortly thereafter. Lois Wells was tending bar and standing next to the cash register. Robert Schultheis was seated at the bar located in the rear part of the barroom. Lloyd Adkins, an off-duty Pinkerton guard, was seated at the bar next to the front entrance. Adkins and Schultheis were approximately 15 to 18 feet apart.

Lois Wells asked the masked men what they wanted. Shelton remained by the front door and Bates moved to the rear area of the bar. The opening to the rear of the bar was located next to where Schultheis was sitting. After Lois Wells inquired as to the nature of their business, Shelton raised the shotgun over the bar aiming directly at

318

her. Wells then stated, "All right, I know what you want."

When Bates started to move around to her side of the bar, it was Wells' intention to let him take the money. As Lois Wells moved to the rear of the bar, she heard Adkins say to Shelton, "Oh, no you don't!" She then turned and looked toward the front of the tavern, where Shelton and Adkins were struggling. Wells heard Shelton shout at Adkins to get back or he would be killed. Wells then observed Shelton push Adkins off balance. Shelton then stepped back and fired the fatal shot directly at Adkins from a distance of several feet.

Meanwhile, Bates engaged Schultheis in a fight and struck him. As a result, Schultheis was knocked to the floor and kicked by Bates. Schultheis than managed to get off the floor and move to a back room and hide $280 that he had on his person.

Lois Wells identified Bates, at the trial, as the man who entered the tavern first and subsequently struck Schultheis.

After the shooting, Bates and Shelton fled the tavern on foot. They went back to "TV Hill" and stripped the stocking masks from their heads and threw them away. The shotgun was then disassembled, and the two returned to 2248 Wheeler Street.

At approximately 1:30 a. m., on November 26, 1974, Kenneth Carter received a telephone call from Bates asking Carter to pick up the shotgun that Shelton had used to murder Adkins. Carter did not reclaim the gun as the appellant had requested.

Carter saw the appellant, at approximately 2:00 p. m., on November 26, 1974, and appellant again told Carter of the events of the preceding evening, including the shooting.

Carter testified at trial that the gun was capable of firing. He also testified that the weapon had to be cocked before it could be fired. The shotgun was identified at trial.

Bates hid the gun in the backyard of his sisters's residence and kept it there for about two days. Then he took the gun, wrapped in a towel and secured with a string, to a

wooded area in Mt. Airy Forest near Kirby Road where he threw the shotgun away.

On December 12, 1974, Bates was placed under arrest. He was repeatedly advised of his constitutional rights and signed a waiver of his rights. The appellant then freely told police of his involvement in the robbery attempt and murder which occurred at the Warner Tavern.

The coroner testified that the cause of death was hemorrhage as a result of a gunshot wound of the chest.

*II.*

Appellant advances four propositions of law, the first of which asserts that:

"The court erred to the prejudice of defendant-appellant in denying his motion to suppress his statement made to law enforcement officers in violation of his rights guaranteed by the Fifth and Sixth Amendments to the Constitution of the United States of America."

The record indicates that Bates was arrested at his sister's home at about 3:00 p. m. on December 12, 1974, and apprised of what the police wished to talk to him about. According to Officer Burgess' testimony, his speech was clear and his appearance normal, and he was neither drunk nor under the influence of drugs. They arrived at the homicide squad office at approximately 3:30 p. m. At that time, Officer Sefton advised him orally of his constitutional rights in an interrogation room. Next, defendant was informed that his brother, Frank, and Kenneth Carter had told police about his involvement in the attempted robbery and killing. He spoke to his brother, who was brought to the interrogation room, and the latter denied saying anything to the police.

Officer Drescher then talked to the appellant after first advising him of his constitutional rights. They talked for an hour. Drescher testified that, based on the fact that he had talked to the appellant for over an hour and upon his prior police experience with persons under the influence of alcohol or drugs, it was his opinion that Bates was not under the influence of an alcoholic beverage or a drug.

After talking with Drescher for an hour, Bates signed a standard police notification of rights form, which waiver set out his constitutional rights, and then gave Drescher a recorded statement. At the outset of the recorded statement, Bates was again advised that:

(1) He had the right to remain silent;

(2) anything he said could be used against him in court;

(3) he had the right to talk to counsel before any questioning;

(4) he had a right to have an attorney with him when he answered questions;

(5) if he could not afford an attorney, one would be appointed for him; and

(6) if he started to answer questions, he still had the right to stop answering questions at any time.

In the course of the interrogation, Officer Burgess asked specifically whether Bates had been drinking or was under the influence of any drugs, and he stated he was not.

Thus, the record discloses beyond peradventure that the appellant knowingly, voluntarily and intelligently waived his constitutional rights. There is nothing in the record to indicate that Bates misapprehended his rights as was the case in *State* v. *Jones* (1974), 37 Ohio St. 2d 21, and *State* v. *Parker* (1975), 44 Ohio St. 2d 172. He was advised of his rights three times: Once by Officer Sefton; once by Officer Drescher; and once in the waiver of rights form at the outset of the recorded statement. He signed the waiver of rights form.

It must also be noted that the state produced an eye-witness, Lois Wells, who identified Bates as one of the two men who attempted to commit aggravated robbery at the Warner Tavern on November 26, 1974, shortly after midnight.

Bates testified in his own behalf and related to the jury essentially the same story he related in the recorded statement. It is not urged by appellant that the introduction

of the recorded statement required him to take the witness stand. Thus, he was not compelled to waive his constitutional right against self-incrimination.

For these reasons, in our judgment, the trial court did not err in overruling appellant's motion to suppress his recorded statement, and his proposition of law No. 1 is rejected.

### III.

For his second proposition of law, appellant claims that:

"The trial court erred to the prejudice of defendant-appellant when it overruled his objection to the receipt in evidence of state's exhibits seventeen and eighteen."

State's exhibit Nos. 17 and 18 are two cardboard targets used to conduct certain tests by police officers for the purpose of establishing the distance between the shotgun barrel and the victim, Adkins. This question of distance was relevant to the issue of whether the shooting was purposeful or accidental. The state's witness referred to the exhibits in offering his opinion that the fatal shot was fired at the decedent from approximately four to five feet away, a conclusion tending to negate appellant's position that the shotgun was fired accidently in the course of a physical struggle over its possession.

The basis for the objection to the exhibits below and the challenge to their admission at the appellate level is that there was no showing that firing the shotgun at exhibit Nos. 17 and 18 recreated a condition substantially similar to the conditions existing at the time of the homicide. More specifically, appellant contends that the cardboard targets provided a different amount of resistance to the shotgun blasts than did Adkins' body, because Adkins wore of number of items of clothing and had a pack of cigarettes in his breast pocket.

A reading of the record reveals that the obvious purpose for which the gun experiments were conducted, and the exhibits with reference thereto introduced, was to demonstrate the *spread*, not penetration of the shotgun pellets.

Evidence of the extent of spread was offered in proof of distance between weapon and victim. With this purpose in mind, any arguable differences between the experiments and the actual conditions as they existed when Adkins was shot, with respect to his clothing and the cigarette package, would be irrelevant to the question of the admissibility of exhibit Nos. 17 and 18.

There was no evidence at the trial that the use of the cardboard did, in fact, create substantially different conditions than those existing at the scene of the homicide. As stated in 21 Ohio Jurisprudence 2d 546, Evidence, Section 522, "* * * the question of admissibility as affected by dissimilarity of conditions is essentially a matter within the discretion of the trial court."

We find no abuse of discretion in the trial court's ruling on this matter. What weight to grant the evidence, of course, rested with the jury. Proposition of law No. 2 is not accepted.

## IV.

Appellant contends in his third proposition of law that:

"The trial court erred to the prejudice of defendant-appellant when it refused to give the standard instruction on accident to the jury."

The record demonstrates the jury was instructed that before it could find Bates guilty of aggravated murder while attempting to commit aggravated robbery, it had to find, among other things, that the killing of Lloyd Adkins was done purposely.

The trial court also instructed the jury as follows:

"Purpose to kill is an essential element of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to kill. A person acts purposely when the gist of the offense is a prohibition against conduct of a certain nature regardless of what the offender intends to accomplish; thereby it is his specific intention to engage in con-

duct of that nature. Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. *To do an act purposely is to do it intentionally and not accidentally.* Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined by the manner in which it was done, the means or weapon used, and all the other facts and circumstances in evidence. If a wonnd [*sic*] is inflicted by a person with a deadly weapon in a manner calculated to destroy life, the purpose to kill may be inferred from the use of the weapon.'' (Emphasis added.)

The court also instructed the jury on lesser included offenses of manslaughter and involuntary manslaughter:

''The crime of manslaughter is distinguished from aggravated murder by the absence or failure to prove purpose to kill.''

As pointed out by the Court of Appeals in its opinion, the trial judge gave an impeccable charge which included the possibility of a finding by the jury of accident, thereby barring a conviction of aggravated murder.

The charge as given was correct; appellant's proposition of law is incorrect and is not accepted.

## V.

It is urged in appellant's fourth proposition of law that:

''The trial court erred as a matter of law when it failed to find the existence of one or more mitigating circumstances on behalf of defendant-appellant relative to the penalty to be imposed for the offense of aggravated murder.''

R. C. 2929.03(E) provides that:

''Upon consideration of the reports, testimony, other evidence, statement of the offender, and arguments of counsel submitted to the court pursuant to division (D) of this section, if the court finds, or if the panel of three judges unanimously finds that none of the mitigating cir-

cumstances listed in division (B) of Section 2929.04 of the Revised Code is established by a preponderance of the evidence, it shall impose sentence of death on the offender. Otherwise, it shall impose sentence of life imprisonment on the offender.''

The mitigation hearing in this cause was heard on the 30th day of June, 1975, before Judge William S. Mathews, Court of Common Pleas of Hamilton County, Ohio. The report of Dr. Hamilton was stipulated as was the report of Dr. McDevitt and Dr. Weaver, except for the final two paragraphs of the latter report. In addition, the probation report was stipulated. The appellant and his mother also testified at the mitigation hearing.

At the conclusion of the hearing, the court ruled that the evidence failed to show by a preponderance that:

(1) The victim of the offense induced or facilitated it;

(2) it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation; or

(3) the offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity.

In the face of the record, this ruling of the trial court and its affirmance by the Court of Appeals is totally justified.

Accordingly, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN, CELEBREZZE, W. BROWN and P. BROWN, JJ., concur.