[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 280.]

THE STATE OF OHIO, APPELLEE, *v*. STALLINGS, APPELLANT.

[Cite as *State v. Stallings*, 2000-Ohio-164.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-640—Submitted April 12, 2000 at the Geauga County Session—Decided July 19, 2000.)

APPEAL from the Common Pleas Court of Summit County, No. 97-05-1118(A).

———————————

{¶ 1} On December 15, 1996, in Akron, Ohio, Michael Stallings, defendant-appellant, agreed with two gang accomplices, Marc Lee ("Lee") and Donzell Lewis ("Lewis"), to rob Eric Beverly ("Beverly"), a reputed local marijuana dealer. Lee furnished a shotgun to defendant, and defendant went with Lewis to an apartment belonging to Beverly's girlfriend where Beverly was visiting. Defendant entered, demanded money and marijuana from Beverly, and shot sixteen-year-old Rolisha "Michelle" Shephard. Defendant then left Akron and was arrested in May 1997 in Cleveland.

{¶ 2} The evidence reveals that a few days before December 15, 1996, Stacy Lewis ("Stacy Lewis"), who lived at the Edgewood Apartment complex in Akron, overheard her boyfriend, Marc Lee, age twenty (also known as "Locc Up"), talking with her fourteen-year-old cousin, Donzell Lewis, about a robbery. However, because the intended victim knew both Lewis and Lee, they decided to get somebody else to rob the victim for them.

{¶ 3} Coincidentally, on December 15, defendant (also known as "St. Ides") and Clara Redd, his girlfriend, along with another woman, were driving back to Cleveland from Columbus. Around 6:00 or 7:00 p.m. that day, defendant and his two friends stopped in Akron at Stacy Lewis's apartment to see Lee, whom defendant knew as a fellow "Crips" gang member from Cleveland. Lee held the

rank of an "OG" or "original gangster," a leadership position in the Crips, and Lewis and defendant were "BGs" (baby gangsters), or ordinary soldiers.

{¶ 4} After defendant arrived at Stacy Lewis's apartment, he agreed with Lee and Lewis to rob a neighborhood marijuana dealer, Eric Beverly. Lee picked defendant as the gunman because he was unknown in Akron. Their plan was to have Lewis, who had previously purchased marijuana from Beverly, secure entry to the apartment of Erika White, Beverly's girlfriend, on the pretext of wanting to purchase marijuana. Once Lewis got inside, defendant, armed with a shotgun, would force his way inside and rob Beverly. Lee gave defendant a breakdown type, single-shot, sawed-off 12-gauge shotgun to carry out the agreed-upon robbery.[1] The plan was to carry out a "simple robbery," and Lewis was to pretend that he was also a robbery victim.

{¶ 5} Sometime after 10:00 p.m., Lewis and defendant went to Erika White's apartment. Redd waited in her car, having been told that defendant left "to go buy some weed." Lewis knocked on the back door at Erika White's apartment, and Kimberly White, Erika's sister, answered the door. When Kimberly White opened the door, she recognized Lewis as Beverly's friend, and called out to Beverly, who was sitting on the couch, "EJ, somebody want[s] you." When Kimberly White turned around, she noticed that another man, whom she did not know, was holding a gun.

{¶ 6} Then Kimberly White screamed and yelled, "He['s] got a gun," and tried to get her cousin, Michelle Shephard, who was also visiting the apartment with Kimberly White, to leave. But Shephard did not leave, and instead picked up her fourteen-month-old son, Christopher Williams, who was sitting on the floor. Kimberly White fled out the front door. While outside, she heard Shephard say,

---

1. In his pretrial statement, defendant said the shotgun was a 20-gauge.

"Please." Kimberly White later identified defendant from a photo lineup as the gunman.

{¶ 7} Lewis testified that Kimberly White answered the back door, screamed, and then ran out the front door. Beverly was asleep on the couch, and Shephard was the only other person in the apartment aside from Christopher and one other young child upstairs.

{¶ 8} Lewis also testified that after they entered, he stood against the wall and held his hands up, pretending that he was a robbery victim. Defendant stood about three or four feet away from Beverly, pointed the shotgun at him, and told him, "Give me the money and the weed." Shephard, who was standing by the couch holding her son, asked Beverly to "give him the marijuana and the money." Lewis also told Beverly, "Give it to him." Beverly never said anything; he was "just looking" at defendant. According to Lewis, defendant then told Beverly, "Give me the money and the weed or I'm going to shoot your girlfriend."

{¶ 9} While Lewis had his back turned, he heard a shot, turned around and saw Shephard on the ground. Christopher, her baby, was also on the ground, crying. Beverly went to help Shephard, and defendant left through the back door.

{¶ 10} In his testimony, Beverly claimed to remember very little of the events that evening, since he had been sleeping, drinking, and smoking marijuana. Beverly recalled that Kimberly White and Shephard were at the apartment, but claimed he did not hear anyone come in or hear any gunshot. Beverly did hear "people hollering" and woke up to find Shephard lying on the floor bleeding. He attempted to revive her and then left. On cross-examination, Beverly admitted that he had been charged with obstruction of justice because of his lack of cooperation.

{¶ 11} The state presented other witnesses also. Holly Setser, who lived at the Edgewood Apartments, heard a woman at 722 Edgewood screaming, "He's got a gun." Then she heard a loud "pop" noise and saw a man carrying a "sawed-off shotgun" running across a parking lot. When the man got in a parked car, the car

took off. While waiting in her car, Redd also heard a shot and saw defendant running to her car, carrying a gun like a "sawed-off shotgun." After defendant jumped in Redd's car, he told her, "Get out of here."

{¶ 12} Redd drove back to Stacy Lewis's apartment, and defendant put the shotgun in the trunk. Lee borrowed Redd's car keys in order to retrieve the shotgun. Defendant said he gave the shotgun back to Lee, but Lee denied receiving the shotgun, and police never recovered the weapon. After an hour, Redd drove to Cleveland, and then she and defendant drove to Detroit, where Redd lived.

{¶ 13} When a police officer entered the crime-scene apartment, he first noticed a "nice big blast of [marijuana] smoke," as well as wet, clean ashtrays. Police found Shephard in the living room, lying on her back, with wounds on her left side and lots of blood. Although she had no pulse, medics took her to a hospital. Later, police discovered that Shephard's son, Christopher, had been in the apartment and had blood coming from his ear. (The evidence suggests he was injured when his mother dropped him.) Within a few days, detectives knew defendant's physical description, that he was called "St. Ides," and that he was from Cleveland or Detroit. Lewis also described that evening's events to police, but did not disclose his participation in the robbery.

{¶ 14} The coroner found that Shephard had a large shotgun wound in her left arm and chest, causing "severe trauma to the chest, lungs, heart, veins * * * [and] bleeding was the cause of death." Her death was instantaneous, and her life could not have been saved by any medical intervention. The coroner found gunpowder stippling on the wound and concluded that the gun muzzle was about six inches away from Shephard when she was shot.

{¶ 15} Michael Roberts, a state forensic expert, examined the shirt that Shephard was wearing when she was shot. A hole in the shirt was consistent with having been caused by a "loose-contact" gunshot wound, and Roberts concluded that the muzzle of the shotgun must have been touching the shirt.

4

{¶ 16} Following an extensive investigation, police discovered that "St. Ides" was Michael Stallings from Cleveland. Following his arrest in May 1997, defendant told police that he had stopped in Akron on December 15 to see Lee. While there, he agreed to act as the gunman for a "weed lick," *i.e.*, a robbery of a local marijuana dealer. Lee furnished him the shotgun, which was supposed to be unloaded. According to defendant, the gun had a hair trigger and accidentally went off as defendant left the apartment. Defendant asserted that he did not think the gun was operable, that he never meant to shoot Shephard, and that Shephard was about five feet away when she was shot.

{¶ 17} In a plea bargain, both Lewis and Lee pled guilty to certain felonies and testified at trial against defendant. In his defense at trial, defendant testified that when he agreed to do the robbery, Lee gave him a sawed-off shotgun and told him the shotgun "wasn't supposed to be loaded." After Lewis knocked on the door, he and Lewis went inside together. According to defendant, Beverly was awake, but did not hand over any money or drugs. Lewis, standing by the wall, hands up, pretending to be a victim, also told Beverly to "Give him the money and the weed." Shephard also encouraged Beverly to give up the money and drugs by telling Beverly, "Give it to him, give it to him."

{¶ 18} After a while, defendant said he "realized [he] wasn't going to stand here and constantly argue with this man about the money and marijuana; so, [he] turned around to leave, * * * heard something drop, * * * turned around[,] and that's when the gun went off." He denied that he pulled the hammer back on the gun. After he saw Shephard fall back, he left the apartment and went to Redd's car.

{¶ 19} Defendant admitted that he pointed the shotgun at Beverly and twice told Beverly, "Give me the money and the weed," but Beverly said nothing. Defendant denied that he ever threatened to shoot Beverly's "girlfriend," and denied that he ever saw a child in the room. Defendant admitted, however, that Lewis told Beverly to give up the money or defendant would shoot his girlfriend.

5

**{¶ 20}** Defendant also denied that he loaded the shotgun or knew that it was loaded. Defendant claimed that Lee told him the gun was unloaded, but he admitted he never checked to make sure. Defendant asserted that he knew how the gun was loaded because he had seen Lee load it before. "[I]t took a lot of work to shut it." He agreed that to load it you had to break the gun open, put the shell in, then close it, and that "it was hard to close."

**{¶ 21}** Defendant testified that he was born in Cleveland in November 1976, and was twenty years old at the time of the offense. He lived mostly in Cleveland and completed the 11th grade of high school. His mother, brother, and sister live in Alabama, and his father is incarcerated in an Alabama penitentiary. He joined the Crips gang when he was thirteen or fourteen and had been "running the streets" since he was eight or nine. Although he has an OG tattoo, he was only a BG in the Crips. Defendant agreed that he had a juvenile record including incarcerations at youth camps for various offenses. As an adult, he had been convicted of receiving stolen property and grand theft of an auto.

**{¶ 22}** In defendant's defense at trial, homicide detective Steven Geiger agreed that Lewis repeatedly lied to police by claiming he was not involved in the robbery.

**{¶ 23}** Despite not guilty pleas, defendant was convicted as the principal offender for the aggravated felony-murder of Shephard (Count I) with death specifications of murder in the course of aggravated robbery (specification 1) and aggravated burglary (specification 2). He was also convicted of aggravated robbery (Count IV) and aggravated burglary (Count VI), along with accompanying gun specifications.[2]

**{¶ 24}** Following a hearing, the jury recommended the death penalty. The trial court sentenced defendant to death for aggravated murder and to prison for the

---

2. Count II did not apply to defendant, and Count III (attempted murder) and Count V (aggravated robbery) were withdrawn before trial.

6

aggravated robbery and burglary.  Defendant now appeals directly to this court as a matter of right.

_____

*Michael T. Callahan*, Summit County Prosecuting Attorney, *Paul Michael* and *Philip Bogdanoff*, Assistant Prosecuting Attorneys, for appellee.

*Lawrence J. Whitney* and *Renee W. Green*, for appellant.

_____

**LUNDBERG STRATTON, J.**

**{¶ 25}** In this appeal, defendant advances sixteen propositions of law. Finding none meritorious, we affirm his convictions.  We have also independently weighed the aggravating circumstances against the mitigating factors, and compared his sentences to those imposed in similar cases, as R.C. 2929.05(A) requires.  As a result, we affirm defendant's convictions and sentence of death.

I

VOIR DIRE ISSUES

*Incorrect statements of law (I, XVI)*

**{¶ 26}** In proposition of law I, defendant argues that during the voir dire examination, the trial court "consistently misstate[d] the law to the jury and violate[d] appellant's due process rights."  Admittedly, the trial court stated at various times during voir dire that "if [the jury] find[s] the mitigating factors outweigh the aggravating circumstances" then it should vote on various life sentences.  Both the prosecutor and defense counsel also sometimes used that formulation or comparable language.

**{¶ 27}** That formulation of the test is incorrect, since the correct test is whether the aggravating circumstances outweigh mitigating factors, a matter on which the prosecution has the burden of proof beyond a reasonable doubt.  See R.C. 2929.03(D)(1) and (2).  The reverse formulation referring to mitigating factors outweighing aggravating circumstances is wrong, since it confuses the burden of

proof. Although referring to mitigation outweighing aggravating circumstances is a common, semantic mistake, it could under other circumstances constitute fatal error. For example, if the aggravating circumstances and mitigating factors are in equipoise, the jury must recommend a life sentence. Counsel and all trial judges should make strong efforts to avoid this mistake.

{¶ 28} However, defendant's counsel never complained about this mistaken formulation at trial. This failure "constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Accord *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

{¶ 29} We conclude that no outcome-determinative plain error occurred here. First, the judge's shorthand references to legal concepts during voir dire cannot be equated to final instructions given shortly before the jury's penalty deliberations. "[T]he trial judge need not at that early stage completely instruct the jury[.]" *State v. Mason* (1998), 82 Ohio St.3d 144, 164, 694 N.E.2d 932, 953. Second, the court during voir dire began any reference to the relevant weighing test by noting that the jury would have to find that the aggravating circumstances outweighed mitigating factors before they could recommend the death penalty. Third, both the trial judge and counsel would, as often as not, state the test completely and accurately during voir dire and omit any reference to mitigating factors outweighing aggravating circumstances.

{¶ 30} Finally, the parties understood and generally articulated the correct legal standard at the penalty phase. The court's penalty instructions correctly stated the applicable law, namely: "The State * * * has the burden of proving * * * beyond a reasonable doubt that the aggravating circumstances * * * outweigh the factors in mitigation[.] * * * Reasonable doubt is present when * * * you cannot say that you are firmly convinced that the aggravating circumstances outweigh the mitigating

factors." Both the death and the life verdict forms reflected the correct legal standard, and the jury's signed death verdict reflected: "We, the Jury, * * * FIND, by proof beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors." Thus, we find that the jury understood the applicable sentencing standard and its sentencing responsibility. *State v. Hill* (1995), 73 Ohio St.3d 433, 438, 653 N.E.2d 271, 277-278.

{¶ 31} We have long recognized, "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus. No such circumstances exist here. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 395, 721 N.E.2d 52, 68; *Hill*, 73 Ohio St.3d at 437, 653 N.E.2d at 277. The court's penalty instructions and verdict forms were accurate, and we do not believe that these inaccurate voir dire references to the weighing process, which occurred five weeks earlier, could have affected the trial result.[3]

{¶ 32} Defendant's remaining complaints about the final instructions are addressed in connection with proposition of law VIII. In sum, we reject proposition of law I.

*Ineffective assistance*

{¶ 33} In proposition of law XVI, defendant argues that his counsel's recitation in voir dire of an incorrect weighing standard, as well as his counsel's failure to object to these references by others, constituted ineffective assistance of counsel. However, reversal of convictions on ineffective assistance requires that the defendant show, first, that "counsel's performance was deficient" and, second, that the deficient performance "prejudiced the defense * * * so * * * as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687,

---

3. Voir dire ended on January 12, 1998. The jury recommended the death penalty on February 18, 1998.

104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 34} Counsel's failure to object to such references, however, does not demonstrate performance "below an objective standard of reasonable representation." *Bradley*, at paragraph two of the syllabus.

{¶ 35} As we recognized earlier, misquoting the statutory weighing process is a common mistake, although one that counsel should avoid. Moreover, defendant has not established that such mistakes in this case, even if repeated, created "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraph three of the syllabus. We do not believe that these shorthand comments about the weighing process, made weeks earlier during voir dire, affected the trial result because the trial court later instructed the jury fully and accurately as to the governing legal standard. A jury is presumed to follow the instructions given to it by the trial judge. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082, 1102-1103; *State v. Ferguson* (1983), 5 Ohio St.3d 160, 163, 5 OBR 380, 383, 450 N.E.2d 265, 268. Finally, the jury's signed verdict form reflected the correct legal standard. See *Hill*, 73 Ohio St.3d at 437, 653 N.E.2d at 277. We reject proposition of law XVI.

*Dismissal of jurors for cause*

{¶ 36} In proposition of law III, defendant argues that the trial court improperly "excused for cause jurors who express[ed] reservations about capital punishment but did not excuse for cause jurors who expressed very strong feelings in favor of capital punishment."

{¶ 37} However, death-qualifying a jury "does not deny a capital defendant a trial by an impartial jury." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph two of the syllabus. Accord *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137. The test for excluding prospective jurors based upon their death-penalty views "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated and remanded on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452, following *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. This test applies to those prospective jurors who favor capital punishment, as well as those who oppose it. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 86, 656 N.E.2d 643, 659.

{¶ 38} Here, the record demonstrates that the views of those prospective jurors excluded would have substantially impaired the performance of their duties. Cf. *Madrigal*, 87 Ohio St.3d at 391, 721 N.E.2d at 65-66; *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, 586. Prospective juror DiBartolomeo, when asked if she could follow the law on capital punishment, replied, "No, I could not." She could not vote for death "under any circumstances" and agreed her views would substantially impair her ability as a juror. Defense counsel also noted that she would have "a real difficult time serving." Juror Barker did not "want to be a part" of capital punishment, agreed it would be "very difficult" to set aside her personal

beliefs, and agreed those beliefs "substantially impair[ed]" her ability to serve as a juror.

{¶ 39} Juror Radabaugh, who was "completely against capital punishment," could not be a part of any death recommendation, and agreed her views substantially impaired her ability to serve as a juror. Defense counsel remarked, "[N]ot much we can do with that." Juror Owens did not believe that she could set aside her personal feelings, follow the law, or vote for the death penalty. She could not vote for death under any circumstances. Defense counsel noted, "I see no rational objection here." Juror Hoot was "adamantly opposed" to the death penalty, and could think of no case in which she would vote for the death penalty. Juror Prentice, initially passed for cause, was recalled because she had been crying and vomiting after thinking about the death penalty. She stated that she "just couldn't live with [herself]" if she voted for death, and there was "absolutely no way [she] could do it."

{¶ 40} Thus, the trial court did not abuse its discretion by excusing those jurors. A "ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *Tyler*, 50 Ohio St.3d at 31, 553 N.E.2d at 587. Accord *State v. Fears* (1999), 86 Ohio St.3d 329, 337, 715 N.E.2d 136, 146; *State v. McNeill* (1998), 83 Ohio St.3d 438, 445, 700 N.E.2d 596, 605. Clearly, "deference must be paid to the trial judge who sees and hears the juror." *Wainwright*, 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853. See, also, *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920-921.

{¶ 41} Nor did the trial court abuse its discretion by retaining three other jurors (Chambers, Harmon, and Oviatt) who supported the death penalty. Admittedly, Juror Chambers thought that if someone took another's life, he should forfeit his own life. However, Chambers agreed to consider mitigating factors and to consider life sentences, including life without parole or with parole possible after

twenty-five or thirty years. Chambers denied that his views substantially impaired his ability to sit as an impartial juror. Again, defendant has not established that the trial court abused its discretion.

**{¶ 42}** Juror Harmon believed that "murder in cold blood is an automatic death sentence," as well as murders for hire. Also, Harmon thought that those who use a gun to commit a crime resulting in death should receive the death penalty. However, defendant never challenged Harmon, thereby waiving any issue as to his selection. Moreover, Harmon agreed to follow the law, instructions, and evidence, rather than his own opinion.

**{¶ 43}** Juror Oviatt supported capital punishment and thought that death was appropriate for murder committed during an armed robbery. Oviatt, however, agreed she could return a life verdict. She also agreed to consider mitigating factors, listen to "what both sides would have to say," and follow the law even though she might have firm convictions otherwise. In sum, Chambers, Harmon, and Oviatt all agreed to follow the law, thereby allowing them to serve as impartial jurors.

**{¶ 44}** Defendant has therefore not established that the trial court abused its discretion in denying these challenges. Cf. *State v. Williams* (1997), 79 Ohio St.3d 1, 5-8, 679 N.E.2d 646, 653-655. Moreover, Chambers, Harmon, and Oviatt never sat on the jury, and defendant waived his final peremptory challenge. Defendant has thus no basis to complain. "[E]rror in the denial of a challenge * * * for cause cannot be grounds for reversal when the defendant did not exhaust his peremptory challenges." *State v. Getsy* (1998), 84 Ohio St.3d 180, 191, 702 N.E.2d 866, 880, citing *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568, 572. Accord *State v. Broom* (1988), 40 Ohio St.3d 277, 287-288, 533 N.E.2d 682, 695. We reject proposition of law III.

*Number of peremptory challenges*

**{¶ 45}** We summarily reject defendant's proposition of law IV. The trial court correctly rejected his motion for twelve peremptory challenges. *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, at paragraph two of the syllabus, and at 246, 530 N.E.2d at 395-396; *Poindexter* at the syllabus.

*State's use of peremptory challenges*

**{¶ 46}** We also summarily reject proposition of law V. The use of peremptory challenges to remove jurors opposed to capital punishment is not improper. *State v. Dennis* (1997), 79 Ohio St.3d 421, 428, 683 N.E.2d 1096, 1104; *State v. Cook* (1992), 65 Ohio St.3d 516, 518-519, 605 N.E.2d 70, 76; *State v. Esparza* (1988), 39 Ohio St.3d 8, 13, 529 N.E.2d 192, 198.

II

WEIGHT AND SUFFICIENCY OF THE EVIDENCE

**{¶ 47}** In proposition of law II, defendant attacks the weight and the sufficiency of the evidence supporting his conviction for aggravated murder, especially the evidence supporting the finding that he purposefully killed Shephard. In a test for sufficiency, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. Therefore, we will examine the evidence to determine whether the average mind would be convinced of defendant's guilt beyond a reasonable doubt. *Jenks* at paragraph two of the syllabus.

**{¶ 48}** In addition, we have also conducted "a full weight-of-the-evidence review," since this case is on direct appeal from the trial court. *State v. Smith* (1997), 80 Ohio St.3d 89, 103, 684 N.E.2d 668, 684. "This [separate] inquiry requires * * * [determining] whether the evidence produced attains the high degree

of probative force and certainty required of a criminal conviction. * * * [Is there] *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. (Emphasis *sic*.)" *Getsy*, 84 Ohio St.3d at 193-194, 702 N.E.2d at 882, citing *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. Weight of the evidence concerns " 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis *sic*.) *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546, quoting Black's Law Dictionary (6 Ed.1990) 1594.

{¶ 49} In reviewing the record as to both weight and sufficiency, we find that the evidence supports each essential element of aggravated murder, as well as the other offenses of which defendant was convicted. No identity issue exists; defendant testified that he held the shotgun during an armed robbery when Shephard was killed.

{¶ 50} The weight of the evidence particularly supports the jury's finding that defendant purposefully killed Shephard. Defendant claimed he did not know the gun was loaded, and did not intend to shoot Shephard. However, he admitted that he carried the shotgun into the apartment, pointed it at Beverly, demanded money and drugs, and implicitly threatened to use it if Beverly did not hand over money and drugs. He even admitted that he knew how to load the shotgun. In fact, according to Donzell Lewis, defendant told Beverly, "Give me the money and the weed or I'm going to shoot your girlfriend," before defendant shot Shephard.

{¶ 51} Intent need not be proven by direct testimony. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. Instead, intent to kill "may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." *State v. Robinson* (1954), 161 Ohio St. 213,

53 O.O. 96, 118 N.E.2d 517, at paragraph five of the syllabus; *State v. Eley* (1996), 77 Ohio St.3d 174, 180, 672 N.E.2d 640, 648.

{¶ 52} We find that defendant's claim that he did not know the gun was loaded to be inherently suspect. Defendant knew about that shotgun's particular characteristics, including how to load it and that it was hard to close. Defendant's assertion that he just decided to leave after Beverly refused to hand over the money also lacks credibility. According to Lewis, defendant specifically threatened to kill Shephard. Finally, the physical evidence, the coroner's testimony, and the testimony of a forensic expert established that defendant held the gun just inches away from Shephard when he fired the fatal shot. This evidence flatly contradicts defendant's pretrial claim that Shephard was five feet away when he shot her.

{¶ 53} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, there is substantial, credible evidence to support the jury's verdict and all essential elements of the crime have been met. Defendant's convictions are not against the weight of the evidence. Additionally, the evidence is legally sufficient to sustain the convictions. We reject proposition of law II.

III

TRIAL PHASE INSTRUCTIONS

*Accident*

{¶ 54} In proposition of law VI, defendant argues that the trial court erred in rejecting his request for an instruction on accident. However, the trial court did not commit prejudicial error by declining to instruct on accident.

{¶ 55} In this case, the trial court fully instructed the jury on the purpose element of aggravated murder. Thus, the trial judge instructed the jury that defendant could not be convicted of aggravated murder unless the jury found that he "purposely caused" Shephard's death, that "[p]urpose to cause the death is an essential element of * * * aggravated murder," and that it "must be established in

this case that at the time in question there was present in the mind of [defendant] a specific intention to cause [Shephard's] death." The court also instructed that "[p]urpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is *to do it intentionally and not by accident.* Purpose and intent mean the same thing." This instruction advises the jury that if it finds that the shooting was the result of an "accident," then the act could not have been done intentionally. Finally, the court also told the jury that "unless [defendant] had the required purpose, he is not guilty of * * * aggravated murder."

{¶ 56} Additionally, the defense claim of accident simply "constitutes a denial or contradiction of evidence offered by the prosecution to prove an intent to kill." *State v. Poole* (1973), 33 Ohio St.2d 18, 20, 62 O.O.2d 340, 341, 294 N.E.2d 888, 890. Here, the trial court instructed the jury on mistake of fact, as to whether defendant knew the gun was loaded, and on the lesser-included offense of involuntary manslaughter. If the jury had any reasonable doubt as to whether defendant purposefully killed Shephard, then it would have found him guilty of that lesser-included offense. The jury could not have reasonably acquitted him of wrongdoing in the killing, since he was engaged in a robbery at the time. Accord *State v. Bates* (1976), 48 Ohio St.2d 315, 323, 2 O.O.3d 453, 457, 358 N.E.2d 584, 589, judgment vacated on other grounds by (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.

*Use of a weapon*

{¶ 57} In proposition of law VI, defendant also complains about standard instructions as to the use of a weapon. The court instructed the jury as follows: "The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the other facts and circumstances in evidence. If a wound is inflicted upon a person with a deadly weapon in the *manner calculated to destroy life or inflict great bodily harm,*

the purpose to cause the death may be inferred from the use of the weapon. The inference is not conclusive and purpose is determined from the facts and circumstances in evidence." (Emphasis added.)

{¶ 58} The foregoing instruction accurately reflects the law and is consistent with our prior decisions. The court said "inferred," not "presumed," and the word "may" is permissive, not mandatory. Further, the court specifically instructed that any such "inference is not conclusive." Defendant's general objection to the instruction lacks merit. See *Getsy*, 84 Ohio St.3d at 196, 702 N.E.2d at 884; *Loza*, 71 Ohio St.3d at 81, 641 N.E.2d at 1104; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 414, 575 N.E.2d 167, 171. Compare *State v. Edwards* (1976), 49 Ohio St.2d 31, 45, 3 O.O.3d 18, 26, 358 N.E.2d 1051, 1061, judgment vacated on other grounds (1998), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155; *Robinson* at paragraph five of the syllabus. See 4 Ohio Jury Instructions (1997) 58, Sections 409.01(5) and (6).

{¶ 59} Alternatively, defendant argues that the trial court should have adopted his suggestion and deleted from this instruction the words "or inflict great bodily harm." Generally, we agree that it is preferable to delete those words in this instruction in murder cases. Some trial courts have done so in murder cases. See *Loza*, 71 Ohio St.3d at 81, 641 N.E.2d at 1104; *Montgomery*, 61 Ohio St.3d at 415, 575 N.E.2d at 172. In contrast, other trial courts in murder cases have included those words in this instruction. *State v. Campbell* (1994), 69 Ohio St.3d 38, 49, 630 N.E.2d 339, 350.

{¶ 60} Under the facts of this case, we have concluded that any error was harmless. Defendant shot Shephard with a shotgun held just a few inches from her chest. The trial judge fully instructed the jury that it must find that defendant intended to kill Shephard for him to be found guilty of murder. A jury instruction "must be viewed in the context of the overall charge." *State v. Price* (1979), 60

Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. We reject proposition of law VI.

{¶ 61} In proposition of law VII, defendant raises other trial-phase instructional issues. Yet, because defendant failed to request specific instructions or object at trial on these points, he waived all but plain error. Crim.R. 30(A); *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. As we discuss below, we find that no alleged deficiency clearly caused a different trial result or created a manifest miscarriage of justice. *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

*Principal offender*

{¶ 62} The trial court instructed that "principal offender means the one who directly caused the death," but defendant argues that this definition was insufficiently elaborate. Yet the instruction given, although brief, was consistent with prior definitions. See, *e.g.*, *Getsy*, 84 Ohio St.3d at 197, 702 N.E.2d at 884 ("one who personally performs every act constituting the offense"); *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746 ("actual killer"). No outcome-determinative plain error occurred, since defendant held the shotgun and fired the fatal shot, and no evidence suggests that an accomplice shot Shephard. See *State v. Biros* (1997), 78 Ohio St.3d 426, 438, 678 N.E.2d 891, 903; *State v. Sneed* (1992), 63 Ohio St.3d 3, 11-12, 584 N.E.2d 1160, 1168.

{¶ 63} Defendant also complains that the jury never specifically found that he was the principal offender. However, the jury implicitly found that fact when it found defendant guilty of death-penalty specifications charging murder during robbery and burglary. Those specifications charged defendant only as a principal offender in the murder and never alluded to the alternate statutory basis of "prior calculation and design." Also, the trial court instructed that to find defendant guilty of the specifications, the jury must find that he was the principal offender. No other

evidence was presented that pointed to anyone else as the shooter; even the defendant admitted he fired the fatal shot. We find no error. See R.C. 2929.04(A)(7); *State v. Woodard* (1993), 68 Ohio St.3d 70, 75, 623 N.E.2d 75, 79; *State v. Bonnell* (1991), 61 Ohio St.3d 179, 184, 573 N.E.2d 1082, 1087.

*Unanimous verdict*

{¶ 64} In proposition of law VII, defendant also argues that the court erred by not instructing the jury "that their verdict must be unanimous within the grouping," referring to "prior calculation and design" and "principal offender." But that claim is inapplicable in this case. As noted, "prior calculation and design" was never an issue in the case; it was not charged in the indictment, nor was it argued or instructed on. Hence, no juror could have returned a verdict on the basis of prior calculation and design.

*Lesser-included offense*

{¶ 65} Defendant also contends in proposition of law VII that the trial court committed plain error by failing to instruct "that the jury need not be unanimous in rejecting a greater offense before considering a lesser offense." That claim lacks any merit. The trial court correctly instructed the jury, "If you find the State * * * failed to prove purpose in the aggravated murder count, *or if you are unable to agree,* you will continue your deliberation and consider the lesser and included offense of involuntary manslaughter." (Emphasis added.)

{¶ 66} No improper "acquittal-first instruction" was given. The court never suggested that the jury must unanimously find the accused not guilty of aggravated murder before considering the lesser offense of manslaughter. The trial court correctly instructed the jury. See *State v. Thomas* (1988), 40 Ohio St.3d 213, 220, 533 N.E.2d 286, 292-293, and at paragraph three of the syllabus. Cf. *State v. Awkal* (1996), 76 Ohio St.3d 324, 334, 667 N.E.2d 960, 969-970; *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687.

*Reasonable doubt*

**{¶ 67}** In proposition of law XIV, defendant argues that the trial court's instructions on reasonable doubt at the trial phase were fatally deficient. Yet, we have repeatedly rejected similar challenges. *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000, 1008; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604; *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus. See, also, *Victor v. Nebraska* (1994), 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583.

IV

PENALTY ISSUES

*Instructions*

**{¶ 68}** In proposition of law VIII, defendant argues that the trial court erred in rejecting various penalty-phase instructional requests. As discussed below, no prejudicial error occurred.

*Deliberations*

**{¶ 69}** The court properly instructed the jury: "If all 12 members  * * * find, by proof beyond a reasonable doubt, that the aggravating circumstances * * * outweigh the mitigating factors, then you must return such finding[.]  * * * On the other hand, if, after considering all of the evidence raised * * * you cannot unanimously agree that * * * the aggravating circumstances * * * outweigh the mitigating factors, then you'll return your recommendation reflecting your decision. In this event you will then proceed to determine which of three possible life imprisonment sentences to impose."

**{¶ 70}** Contrary to defendant's claims, the court did not create prejudicial error by declining to instruct that the jury "need not unanimously reach a verdict first on whether or not to impose the death penalty, before moving on to consider the three" possible life sentences. The instructions given explicitly advised that if jurors were unable to unanimously agree to recommend death, they should consider life sentences. The jury was thus implicitly advised that a single juror could prevent

a death penalty and that if they were unable to agree, they could consider life sentences.

{¶ 71} Unlike *State v. Brooks* (1996), 75 Ohio St.3d 148, 159-160, 661 N.E.2d 1030, 1040-1041, the trial court here never instructed the jury that it had to unanimously reject the death penalty before it could consider a life sentence. Instead, "[t]he jury was free to consider a life sentence even if jurors had not unanimously rejected the death penalty." *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 95. The instructions were consistent with R.C. 2929.03(D)(2), and no prejudicial error resulted from rejecting defense requests. See *Madrigal*, 87 Ohio St.3d at 393-395, 721 N.E.2d at 67-69; *State v. Smith* (2000), 87 Ohio St.3d 424, 437, 721 N.E.2d 93, 109; *State v. Bey* (1999), 85 Ohio St.3d 487, 497, 709 N.E.2d 484, 496. Cf. *Jones v. United States* (1999), 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (Eighth Amendment does not require jury members to be instructed as to the consequences of their failure to agree.).

{¶ 72} Nonetheless, we reiterate that trial courts should explicitly instruct, as we directed in *Brooks*, 75 Ohio St.3d at 162, 661 N.E.2d at 1042, that a single juror "may prevent a death penalty recommendation by finding that the aggravating circumstances * * * do not outweigh the mitigating factors." *Madrigal*, 87 Ohio St.3d at 394, 721 N.E.2d at 68.

### *Reasonable doubt*

{¶ 73} In proposition of law VIII, defendant also argues that the court erred by not instructing, as requested, that "[r]easonable doubt is present when you are not firmly convinced that death is the appropriate punishment." In fact, the trial court instructed the jury that "[r]easonable doubt is present when you are not firmly convinced that the aggravating circumstances outweigh the mitigating factors." The differences between these two instructions are minimal, the instruction given was accurate, and defendant's claims of error lack any merit. Cf. *State v. Goff*

(1998), 82 Ohio St.3d 123, 131-132, 694 N.E.2d 916, 923-924; *Taylor*, 78 Ohio St.3d at 29, 676 N.E.2d at 96.

*Purpose*

{¶ 74} Despite defendant's claims in proposition of law VIII, the court need not have instructed in the penalty phase that "[a] person acts purposely when it is his intention to cause the death of the person killed." At the trial phase, the trial court fully instructed on purpose and intent and need not have repeated those instructions at the penalty phase where they were unnecessary.

*Evidence*

{¶ 75} In proposition of law VIII, defendant also argues that the court erred by rejecting his suggestion to instruct the jury to "disregard any testimony that was ruled inadmissible or successfully challenged[.]" Yet that complaint lacks any merit. The court did explicitly instruct the jury: "Statements and answers that had been stricken by the Court to which you were instructed to disregard must be treated as though you never heard them. You must not speculate as to why the Court sustained objections to any questions or what the answer might have been. You must not draw any inference or speculate on the truth of any suggestion included in an unanswered question."

*Recommendation*

{¶ 76} In proposition of law VIII, defendant complains that the court erred by referring to the jury's penalty verdict as a recommendation. However, use of that term, while not preferred, accurately reflects Ohio law, does not diminish the jury's overall sense of responsibility, and does not constitute reversible error. *State v. Keith* (1997), 79 Ohio St.3d 514, 517-518, 684 N.E.2d 47, 54; *Woodard*, 68 Ohio St.3d at 77, 623 N.E.2d at 80-81; *State v. Henderson* (1988), 39 Ohio St.3d 24, 29, 528 N.E.2d at 1243.

*Improper outside influence on jury*

{¶ 77} In proposition of law IX, defendant argues that the trial court should have declared a mistrial due to "a possibility that the impartiality of three * * * jurors was affected by an improper comment outside of the courtroom."

{¶ 78} Following a lunch break during the trial, as jurors were walking up a staircase, "a tall black gentleman * * * said to the three of us [Clemens, Johnston, and Brettschneider] that 'nothing short of the death penalty would be satisfactory' and repeated it two or three times." After Clemens reported this incident, the trial court, in chambers with counsel and defendant, questioned the three jurors. Clemens reported that she did not feel threatened, that there was no other conversation, that nothing was said to other jurors, and that this incident would not affect her ability to be fair and impartial.

{¶ 79} Juror Johnston also reported that the man said, "Anything but the death penalty would be unacceptable." Although the incident was "somewhat ominous," Johnston never felt threatened, and agreed that his impartiality or his ability to assess the man's testimony if he were a witness would not be affected. Juror Brettschneider heard a man say something, but Brettschneider "wasn't paying attention," did not know if the man was talking to them, and agreed his impartiality would not be affected. The court denied defendant's motion for a mistrial, finding the jurors answered the questions truthfully and honestly.

{¶ 80} After Eric Beverly testified later that day, defense counsel asserted they suspected Beverly was the man who approached the jurors. Beverly told the prosecutor that he only said to jurors something like, "Do the right thing."

{¶ 81} The trial court acted properly in this case by questioning the jurors and allowing counsel to question them. "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." *Phillips*, 74 Ohio St.3d at 88, 656 N.E.2d at 661-662, citing *Smith v. Phillips* (1982), 455 U.S. 209, 215-216, 102 S.Ct. 940,

24

945, 71 L.Ed.2d 78, 84, and *Remmer v. United States* (1954), 347 U.S. 227, 229-230, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656.  Defendant has not complained about the conduct of the hearing.  Cf. *State v. Henness* (1997), 79 Ohio St.3d 53, 64-65, 679 N.E.2d 686, 696-697.

{¶ 82} Instead, defendant argues that the jurors' impartiality may have been affected.  However, "[i]n cases involving outside influences on jurors, trial courts are granted broad discretion  in * * * determining whether to declare a mistrial or to replace an affected juror."  *Phillips*, 74 Ohio St.3d at 89, 656 N.E.2d at 661.  Accord *Keith*, 79 Ohio St.3d at 526-527, 684 N.E.2d at 60.  Also, the complaining party must show actual prejudice.  *Id.* at 526, 684 N.E.2d at 60.  See, also, *Phillips*, 455 U.S. at 215, 102 S.Ct. at 945, 71 L.Ed.2d at 85; *United States v. Zelinka* (C.A.6, 1988), 862 F.2d 92, 95; *United States v. Sylvester* (C.A.5, 1998), 143 F.3d 923, 933; Crim.R. 33(A).  In this case, defendant has not demonstrated any such prejudice.

{¶ 83} Moreover, defendant has not established that the trial court abused its broad discretion.  The incident was momentary; the information given was Beverly's personal opinion, not fact; only two jurors heard the remark; and each of the three jurors declared unequivocally that they would not be affected by the event.  "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court."  *Phillips*, 74 Ohio St.3d at 89, 656 N.E.2d at 661, citing *Smith v. Phillips*, 455 U.S. at 217, 102 S.Ct. at 947, 71 L.Ed.2d at 86, fn. 7.

*Appropriateness of death penalty*

{¶ 84} In proposition of law XI, defendant argues that the death penalty is inappropriate and disproportionate in this case.  We have evaluated those claims in the sentence evaluation.

V

CONSTITUTIONAL ISSUES

**{¶ 85}** We summarily reject defendant's claims in propositions of law X, XI, and XII, which challenge the constitutionality of Ohio's system of proportionality review. See *State v. Moore* (1998), 81 Ohio St.3d 22, 39, 689 N.E.2d 1, 16; *State v. Davis* (1992), 63 Ohio St.3d 44, 49-50, 584 N.E.2d 1192, 1197; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. We also reject defendant's proposition of law XIII. Ohio's death penalty statute is constitutional "in all respects." *State v. Evans* (1992), 63 Ohio St.3d 231, 253, 586 N.E.2d 1042, 1060. See *Poindexter,* 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

**{¶ 86}** In proposition of law XV, defendant argues that the language, "[a]ny other factors that are relevant to the issue of * * * death" in R.C. 2929.04(B)(7), "is unconstitutionally vague and may be understood by jurors as reason for imposing the death sentence." Here, defendant makes the novel argument that the open-ended feature of R.C. 2929.04(B)(7), which allows the jury to consider "any other factors" as potential mitigating factors, is unconstitutional.

**{¶ 87}** However, defendant failed to raise this issue at trial and thereby waived all but outcome-determinative plain error. Crim.R. 30(A); *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, at the syllabus; *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156.

**{¶ 88}** Moreover, no plain or other error exists. Defendant's arguments contradict crucial aspects of death-penalty jurisprudence. In fact, error could be created if a court were to omit the "other factors" language. A " 'sentencer, in all but the rarest kind of capital case, [must] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

less than death.' (Emphasis *sic.*)" *Jenkins*, 15 Ohio St.3d at 189, 15 OBR at 332, 473 N.E.2d at 288, quoting *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973, 990. See, also, *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (error to exclude evidence of defendant's adjustment to incarceration); *Eddings v. Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (error not to consider defendant's upbringing and turbulent family history).

**{¶ 89}** The court's reference to the "any other factors" language of R.C. 2929.04(B)(7) simply gave effect to the constitutional precept that the jury must be allowed to consider any relevant evidence the accused offers as mitigating. The court did not mislead the jury into believing mitigating factors were nonstatutory aggravating circumstances. We reject proposition of law XV.

VI

INDEPENDENT SENTENCE EVALUATION

*Evidence at penalty hearing*

**{¶ 90}** At the start of the penalty hearing, Brenda Shephard testified for the state that her daughter, Michelle Shephard, was in the tenth grade when she was killed. Shephard had five brothers and Christopher, then fourteen months old, was Shephard's son. Shephard's family will "miss her a lot," and her father, who lives in Arkansas, loved her very much. Since Shephard died, life has "been hard[.] * * * [T]he baby * * * couldn't sleep at night * * * [and] would wake up * * * screaming and hollering[.]" Brenda Shephard also testified that Christopher keeps asking for his mother although they told him she is gone.

**{¶ 91}** According to Karen Redmon, defendant's cousin, his mother raised him in "the projects, bad neighborhoods" in Cleveland. His mother would not work, but still neglected the children, defendant and a brother and sister. As a result, the "kids were filthy from head to toe" and half-starving most of the time. They relied on friends to give them old clothes to wear. Defendant said that he had

been molested as a child, but his mother "didn't believe him." Defendant was "real close, real close" to an Aunt Rosie, who looked after him when she could.

{¶ 92} Reverend John Wiseman, jail chaplain, believed that defendant has shown "a great deal of remorse" about what happened to Shephard and the fact that her son will be raised without a mother. Defendant participates in Bible study, accepts clergy visits, and would be able to lead a useful life in prison if his life is spared.

{¶ 93} Gerald Miles, the principal detective investigating this case, agreed that defendant cooperated by not resisting arrest, and admitted his name and involvement in the case when questioned. While confessing, defendant was crying, and said he could not sleep and would "wake up in the middle of the night[,] reliving the incident and * * * screaming." Robert Cox, a parole supervisor, testified about the meaning of life without parole.

{¶ 94} Joseph Bendo, Ph.D., a psychologist, performed several tests on defendant and also interviewed him. Bendo found that as a youth, defendant lacked structure or support and attended numerous elementary schools. His mother neglected, humiliated, and degraded him, and he was also physically abused. Throughout his life, defendant has suffered from asthma and attention-deficit-hyperactivity disorder (ADHD). His IQ is below average, he reads at a third-grade level, he tends to be a follower, and he has a history of "very severe head injuries" and alcohol and drug abuse. In 1989, one medical report stated that defendant suffered from "mild mental retardation" and some "psychotic-like symptoms." Another 1989 report described him as "undersocialized, troubled and bewildered," and "inclined to fantasize."

{¶ 95} Dr. Bendo found that defendant has a "strong sense of inadequacy," and is "very much alienated from family and other social systems." Yet, defendant has a "spiritual side," has been involved at times with church activities, and has strong remorse for the crime he committed. Defendant, trained as a barber, could

28

function well in prison. Dr. Bendo believes that on December 15, defendant was "pretty much ordered or strongly encouraged to join the effort" already planned and was also under the influence of marijuana and alcohol.

{¶ 96} In an unsworn statement, defendant expressed his remorse and sorrow to Shephard's mother, her son, brothers, and other relatives and asserted he "never meant to kill" her. He ran because he was scared, but hoped he would be convicted only of manslaughter, although he agreed the trial was fair. He asked the jury to spare his life.

{¶ 97} At sentencing, Reverend Wiseman asserted that one juror wanted to visit defendant in jail and tell him that several jurors did not want to sentence him to death, but felt they had to do so given the trial court's instructions. Defendant expressed his remorse to the court and asked again for a life sentence.

*Sentence evaluation*

{¶ 98} After independent assessment, the evidence proves beyond a reasonable doubt the aggravating circumstances charged against defendant. The jury found and the evidence demonstrates that defendant purposely killed Shephard during an aggravated robbery and aggravated burglary in violation of R.C. 2929.04(A)(7).

{¶ 99} We find nothing in the nature and circumstances of the offense to be mitigating. Defendant deliberately took a sawed-off shotgun into a home in order to rob those inside. When the robbery plan was thwarted, he threatened and then shot a teenage mother holding her baby in her arms. Then he fled the scene, offering no assistance to the victim. Even defense counsel characterized this murder as "brutal, cruel, and senseless."

{¶ 100} Defendant's history and background do reflect some mitigating features entitled to weight. Defendant was raised in deplorable, slum-like conditions, and his mother humiliated, mistreated, and neglected her children. Thus, defendant, from an early date, lacked support and structure in his life, became

alienated from society and his family, and turned to the streets and gangs. His upbringing and difficult childhood deserve some mitigating weight. See *State v. Cornwell* (1999), 86 Ohio St.3d 560, 573, 715 N.E.2d 1144, 1155.

{¶ 101} Dr. Bendo reports that defendant has also suffered throughout his life from asthma and ADHD. He has a history of head injuries and a below average IQ. At the time of the offense, Dr. Bendo believes defendant was strongly encouraged to commit the crime and was under the influence of alcohol and marijuana.

{¶ 102} Yet Dr. Bendo reports that defendant has a "spiritual side" and expressed strong remorse for the crime. Defendant, in his unsworn statement, also expressed strong remorse. Dr. Bendo believes that defendant, trained as a barber, could readily adapt to life in prison. Defendant's mental condition, his limited intellect, his remorse, and his adaptability to life in prison are given weight as "other factors" in mitigation. R.C. 2929.04(B)(7). See *Fears*, 86 Ohio St.3d at 348-349, 715 N.E.2d at 154; *State v. Landrum* (1990), 53 Ohio St.3d 107, 124-125, 559 N.E.2d 710, 729. When finally arrested, defendant also cooperated with police, which we consider to be a mitigating "other factor" under (B)(7). *State v. Bays* (1999), 87 Ohio St.3d 15, 34, 716 N.E.2d 1126, 1145.

{¶ 103} The evidence does not support finding any statutory mitigating factors in R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(5) (lack of criminal record); or (B)(6) (accused not principal offender). The factor in (B)(3) (impaired mental capacity) is inapplicable, since Dr. Bendo's testimony did not establish such a mental disease or defect. Defendant's age, which was twenty at the time of the offense, is given some weight in mitigation. See R.C. 2929.04(B)(4); *State v. Baston* (1999), 85 Ohio St.3d 418, 431, 709 N.E.2d 128, 139.

{¶ 104} We find beyond a reasonable doubt that the aggravating circumstances, *i.e.*, the murder was committed during a burglary and a robbery,

R.C. 2929.04(A)(7), do outweigh the combined mitigating factors. While defendant had a difficult childhood, he also had choices to make, and he received some guidance and assistance from concerned relatives. Aside from ADHD, a relatively common disorder, no evidence exists of serious mental disturbances. Additionally, defendant has clearly had previous opportunities to remove himself from gang activities. His remorse, age, and belated cooperation with police are given modest weight.

{¶ 105} In contrast, the facts surrounding the aggravating circumstances show a brazen, callous robbery and burglary committed in connection with a brutal murder. The facts show that defendant threatened and then killed a teenage mother when she was holding her child, in order to carry out the object of the burglary and robbery. Thus, the death sentence in this case is appropriate.

{¶ 106} We have also concluded that imposing the death penalty in this case is neither excessive nor disproportionate when compared with similar felony-murder cases involving a robbery. Some of these defendants had strong mitigating evidence. See, *e.g.*, *Baston*, 85 Ohio St.3d at 430-431, 709 N.E.2d at 138-139 (twenty year old, neglected childhood, remorse); *State v. Sheppard* (1998), 84 Ohio St.3d 230, 240-241, 703 N.E.2d 286, 296 (eighteen year old, diagnosed "paranoid schizophrenic," no prior criminal history); *McNeill*, 83 Ohio St.3d at 453-454, 700 N.E.2d at 610-611 (troubled upbringing, nineteen year old, borderline intelligence); *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482 (troubled upbringing, eighteen year old, mental problems); *State v. Benge* (1996), 75 Ohio St.3d 136, 661 N.E.2d 1019 (troubled upbringing, prior good character, hard worker, lack of prior criminal convictions); *Woodard*, 68 Ohio St.3d 70, 623 N.E.2d 75 (troubled upbringing, nineteen year old); *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253 (terrible childhood, IQ of 66).

{¶ 107} Additionally, the death penalty is not excessive or disproportionate when compared with other felony-murder cases of burglary in which the death

penalty was imposed. See, *e.g.*, *State v. O'Neal* (2000), 87 Ohio St.3d 402, 418-419, 721 N.E.2d 73, 89-90 (prior military service, hard worker, "mixed personality disorder"); *Goff*, 82 Ohio St.3d 123, 694 N.E.2d 916 (nineteen year old, "chaotic" background, substance abuse); *Campbell*, 69 Ohio St.3d 38, 630 N.E.2d 339 (serious psychological problems from scarring); *State v. Franklin* (1991), 62 Ohio St.3d 118, 580 N.E.2d 1 (twenty-one year old with no significant prior criminal record); *Bonnell*, 61 Ohio St.3d 179, 573 N.E.2d 1082; *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97 (twenty-two year old); *Landrum*, 53 Ohio St.3d 107, 559 N.E.2d 710 ("child-like" twenty-three year old, no significant prior criminal history).

{¶ 108} Accordingly, the judgment of the court of common pleas is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK JJ., concur.

---

APPENDIX

{¶ 109} "*Proposition of Law Number One:* The court permits prejudicial error when it consistently misstates the law to the jury and violates appellant's due process rights.

{¶ 110} "*Proposition of Law Number Two:* The conviction of the appellant for the charge of aggravated murder in this case is against the manifest weight of the evidence. The evidence was insufficient as a matter of law to support appellant's conviction for aggravated murder and should be reversed.

{¶ 111} "*Proposition of Law Number Three:* Appellant's due process rights protected by Amendment 14, United States Constitution are violated when the trial court dismisses for cause jurors who express views against capital punishment.

**{¶ 112}** "*Proposition of Law Number Four:*  It is error for the trial court to overrule an appellant's motion for twelve (12) peremptory challenges to prospective juries.

**{¶ 113}** "*Proposition of Law Number Five:*  It is error for the trial court to overrule defendant's motion to prohibit the use of peremptory challenges to exclude jurors who express concerns about capital punishment, in violation of defendant's Fifth, Sixth, Eighth and Fourteenth Amendmen[t] [rights] to the United States Constitution.

**{¶ 114}** "*Proposition of Law Number Six:*  It is error for the trial court to fail to instruct the jury pursuant to the request of appellant on law pertinent to the case all in violation of appellant's rights as guaranteed in the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 115}** "*Proposition of Law Number Seven*:  When the trial court commits plain error in its instructions to the jury in the first phase and in the verdict forms the appellant is denied a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution.

**{¶ 116}** "*Proposition of Law Number Eight:*  The trial court commits prejudicial error in failing to instruct the jury as requested by the appellant in the second phase of this trial in violation of the appellant's Fifth, Sixth, Eighth and Fourteenth Amendment rights to the United States Constitution.

**{¶ 117}** "*Proposition of Law Number Nine:*  The trial court commits prejudicial error in violation of appellant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution in failing to grant a mistrial when there is a possibility that the impartiality of three (3) of the jurors was affected by an improper comment outside of the courtroom.

**{¶ 118}** "*Proposition of Law Number Ten:*  It is error for a trial court to impose a death sentence when the death penalty law as currently applied in Ohio violates R.C. 2929.05(A) by requiring appellate courts and the Supreme Court, in

conducting their R.C. 2929.04(A) review of 'similar cases' for proportionality, to examine only those cases in which a death sentence was imposed and ignore those in which a sentence of life with parole eligibility after twenty full years or life with a parole eligibility after thirty full years was imposed. The current method also violates the rights to a fair trial and due process, results in cruel and unusual punishment, and implicates others of appellant's protected rights as well, all as set forth in the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and in Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

{¶ 119} "*Proposition of Law Number Eleven:* It is prejudicial error to sentence defendant to the death penalty, when, based upon the law and the record of this case, the sentence of death herein is inappropriate and is disproportionate to the penalty imposed in similar cases, in violation of defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10, and 16 of Article [I] of the Ohio Constitution.

{¶ 120} "*Proposition of Law Number Twelve:* The proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code Section 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code 2929.05, in violation of defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10 and 16 of Article [I] of the Ohio Constitution.

{¶ 121} "*Proposition of Law Number Thirteen:* R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 as read together and as applied in this case violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16 of Article I of the Ohio Constitution.

**{¶ 122}** "*Proposition of Law Number Fourteen:* The Due Process Clause is violated by a jury charge which permits a criminal conviction on proof less than beyond a reasonable doubt.

**{¶ 123}** "*Proposition of Law Number Fifteen:* R.C. 2929.04(B)(7) is unconstitutionally vague and may be understood by jurors as reasons for imposing the death sentence.

**{¶ 124}** "*Proposition of Law Number Sixteen:* The appellant's right to effective assistance of counsel is prejudiced by counsel's deficient performance."