JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Sherry West's delayed appeal is from her jury trial convictions of the following: (1) count one, receiving stolen property (R.C. 2913.51); and, (2) count two, possession of criminal tools (R.C. 2923.24). For the reasons adduced below, we affirm.
{¶ 2} The mise-en-scéne reveals that the offenses in issue occurred on the evening of March 10, 2000, at The GAP clothing store located at The Westlake Promenade Shopping Center in Westlake, Ohio. The management of the store had been previously instructed to notify the police if the appellant entered the store with a particular group of friends, who were known to make frequent refunds at stores. Appellant, because she had a history of returning merchandise to the store for a refund or replacement, was known to the staff of the store as "Tracey Davis" or "Asia McQueen."
{¶ 3} At the time of the offenses, appellant had entered the store accompanied by a group of five friends (her co-defendants), carrying GAP bags. Appellant and a companion (Darlene Delraye) went to the register desk and, in a loud exchange with the staff, began demanding a return or exchange of amounts of merchandise they had in their possession and proceeded to tell the staff how to process the refund. The staff refused to make a return based on one receipt provided by the "shoppers" because that receipt had already been used to make a refund and appeared to have been altered so as to make it appear that it had not already been the subject of a return. This prompted loud accusations of racism by the group. The staff did honor a number of cash return requests made by the shoppers. As this refund confrontation was going on at the desk area, which occupied the staff of the store to an extent that there was no employee available to oversee the merchandise areas, the remainder of appellant's associates milled about the store.
{¶ 4} As they had been instructed, the management, who was nervous about the situation, notified the police at approximately 7:00 p.m., who responded to the store location. The police, who were partially concealed from view behind a column outside the store and while looking through the store windows, noted the distraction occurring at the counter and observed one of the appellant's associates (Roderick Burnett), with the aid of another associate (Alphonso Burnett) who appeared to be acting as a lookout, shoplift merchandise from the store and put it into his GAP bag.
{¶ 5} The police then entered the store, at which time these six "shoppers" were at the register area. The police placed Roderick Burnett under arrest for theft. The bag which Roderick Burnett had used in the theft was at the feet of Leonard Burnett, who now claimed ownership of the bag and its contents. When one of the officers attempted to speak with Leonard Burnett, co-defendant Darlene Delraye claimed that Leonard Burnett was her juvenile son, and Leonard Burnett claimed that he had receipts for the items in the bag. Delraye and Leonard Burnett attempted to pass receipts between them as one of the officers ordered them to stop interfering with the investigation. At that point, the females in the shopping group began getting loud, accusing the police of arresting Roderick Burnett without a reason. The two officers then made a call for back-up.
{¶ 6} Once the additional back-up had arrived, the suspect shoppers were escorted outside the store. During detainee interviews by the police, a number of things about the group raised suspicions. Leonard Burnett identified himself as Mikell Burnett and gave 1982 as his year of birth, which would make him a juvenile at the time. Roderick Burnett and Leonard Burnett each claimed to be juveniles and to have known one another only by nicknames.[1] Darlene Delraye identified herself as Rachel Burnett, claimed to have come to the store by bus, but could not identify the bus number or route, and refused to give any more information. Amber Burnett identified herself as Evelyn Brown and claimed no association with the males in the group who had been arrested for shoplifting. Alphonso Burnett identified himself as Elray Johnson, and further claimed the following: (1) that he was a juvenile; (2) that he and the group had arrived at the GAP store location via public bus transportation, but he was not with the group and did not come into the store with them; and, (3) that although he had a GAP bag with merchandise in it, the receipts in his possession did not correlate with all of the bag's merchandise. Appellant, who was recognized by one of the officers, refused to give any identifying information to the police. Based on these curios, the group was taken to the police station.
{¶ 7} At the station, the possessions of the group were inventoried, and the group questioned. This questioning and inventory presented further evidence of wrongdoing.[2]
{¶ 8} All the defendants claimed to be unemployed.
{¶ 9} Delraye had keys for an automobile, which later were found to belong to a 1993 Lincoln Continental vehicle in the GAP store's parking lot. This car, which bore fictitious license plates, was recovered and an inventory of its trunk revealed ten bags of new clothing bearing store tags, primarily GAP-brand clothing, worth thousands of dollars. The passenger compartment of the vehicle also contained GAP shopping bags, new and used clothing, and other items. Delraye also gave several more different identities and dates of birth. Delraye also had in her possession a large number of store receipts, and a date book which contained, in addition to receipts from a number of GAP stores in northern Ohio and Pennsylvania, several "shopping lists" with a description of clothing, including color, style, and size, that matched items listed by the bar codes or item numbers on receipts.
{¶ 10} Appellant had in her possession a large number of receipts and $806 in cash. At a later point, despite the group having claimed that they came to the store by bus, a 1994 Pontiac Grand Prix automobile was impounded from the store's parking lot. It was determined that this Pontiac was appellant's. Found inside this Pontiac were ten bags of new clothing, primarily from The GAP.
{¶ 11} Roderick Burnett's store bag contained eighteen (18) items of clothing valued at $577.50, but with corresponding receipts.
{¶ 12} Alphonso Burnett had a bag containing several new items from an Eddie Bauer store, even though there is no Eddie Bauer store in Westlake, Ohio. The bag also contained a pair of GAP khaki pants and four khaki shirts from The GAP; there was no receipt for these items.
{¶ 13} In all, there were over 200 items of GAP clothing found in the possession of the defendants and in their two vehicles. The total value of these GAP items was $9,215.10.
{¶ 14} Westlake Police Detective Tolaro, who testified for the prosecution, examined the receipts found in the defendants' possession and compared the amount of purchase receipts against the amount of return receipts. The receipts for purchases totaled $14,825.43 while the receipts for returns totaled $19,019.33; thus, not accounting for altered returns, the returns exceeded purchases by $4,193.90. His tracking of several specific types of clothing, specifically 29 transactions involving Capri pants and approximately 20 transactions involving suede jackets, corroborated the lack of a matching receipt for each transaction and the presence of more receipts with returns as compared with purchases. The detective also noted that many of the receipts showed signs of having been altered in order to erase return markings from original receipts. This permitted an altered original receipt to be used more than once for return purposes. Some items were also returned more than once using an original receipt for one return and a gift receipt for a second return. His examination also revealed that there were some instances where a cash refund was given despite there being no original receipt presented, in apparent contravention of GAP policy.
{¶ 15} City of Cheektowaga, New York, Police Lieutenant Eugene Leahy, III, testified on behalf of the prosecution. Lieutenant Leahy testified that appellant, Amber Burnett, Roderick Burnett, Alphonso Burnett and Delraye were arrested on May 22, 2000, for having committed a similar clothing refund scam at a GAP store in Cheektowaga, New York, approximately two months after the group had committed the Westlake offenses in issue. See Tr. 516-533. The same factors were present in this New York scheme as in the Westlake scheme, namely, aliases, large amounts of cash, volumes of receipts, altered receipts, shoplifting, distracting the store staff through creating a commotion and exhibiting a demanding attitude, and large amounts of clothing found in the defendants' cars.
{¶ 16} During appellant's trial, only co-defendant Leonard Burnett testified for the defense; there were no other witnesses for the defense. All the defendants, except for Delraye (who was tried separately subsequent to a return of capias and convicted on all counts), were tried jointly and convicted on all counts on December 4, 2000. Appellant was sentenced on January 5, 2001 to 15 months on count 1, and 11 months on count 2, concurrent, plus costs, with credit for time served.
{¶ 17} This delayed appeal from the sentencing order of January 5, 2001 presents three assignments of error.
{¶ 18} The first assignment of error provides:
 {¶ 19} I. TRIAL COUNSEL (sic) ERRED IN NOT GRANTING APPELLANT'S REQUEST FOR NEW COUNSEL.
{¶ 20} Despite the language of the assignment, appellant argues that the trial court erred in not granting appellant's request for new counsel.
{¶ 21} The issue of multiple representation of defendants and the replacement of counsel based on a conflict of interest was recently addressed in State v. Lordi (2000), 140 Ohio App.3d 561, 573:
 {¶ 22} Where there is a right to counsel, the Sixth Amendment to the United States Constitution guarantees that representation shall be free from conflicts of interest. State v. Dillon (1995), 74 Ohio St.3d 166, 167, 657 N.E.2d 273. Both defense counsel and the trial court are under an affirmative duty to insure that a defendant's representation is conflict free. Id. The trial court's duty arises when the court knows or reasonably should know a possible conflict of interest exists, or when the defendant objects to multiple representation. State v. Manross (1988), 40 Ohio St.3d 180, 181, 532 N.E.2d 735 cert. denied (1989), 490 U.S. 1083, 104 L.Ed.2d 667, 109 S.Ct. 2106. When this duty arises, the court is constitutionally required to conduct an inquiry into a possible conflict of interest. A lawyer represents conflicting interests when on behalf of one client, it is his duty to contend for something which his duty to another client requires him to oppose. 40 Ohio St. 3d at 182. A possibility of conflict exists when the interests of the defendant may diverge at some point so as to place the attorney under inconsistent duties. Id. If a question of conflict of interest arises after trial, the defendant must prove an actual conflict of interest, as opposed to a serious potential for conflict. Id. at syllabus. (Italicization added.)
{¶ 23} At trial, appellant and her co-defendants were represented by retained defense attorney Anthony Gedos.
{¶ 24} On September 26, 2000, approximately two months prior to the commencement of the trial, the court conducted a hearing on the defendants' motion to suppress evidence found in the automobiles. At the start of this hearing, the court explored the issue of multiple representation of the defendants and made inquiries of each defendant concerning the potential for a conflict of interest resulting from such representation. With respect to appellant, the following exchange occurred:
 {¶ 25} THE COURT: I'm going to ask each of you to stand up, state your name. I'll ask you a question. We'll begin with you.
{¶ 26} THE DEFENDANT: Sherry West.
 {¶ 27} THE COURT: Sherry West, do you object to Mr. Gedos representing you along with everybody else?
{¶ 28} THE DEFENDANT: For this hearing, no.
 {¶ 29} THE COURT: Not for this hearing. He represents you for this case.
{¶ 30} THE DEFENDANT: Well, well, yes.
{¶ 31} THE COURT: You do object?
 {¶ 32} THE DEFENDANT: I mean, no, I don't object, not at this time. (Suppression Tr. 5; italicization added.)
{¶ 33} Immediately after each of the defendants had individually voiced their approval of joint representation by attorney Gedos, attorney Gedos made a statement to the court:
 {¶ 34} THE COURT: All right. Anything you want to put on the record regarding that, Mr. Gedos?
 {¶ 35} MR. GEDOS: No. I have discussed that issue with my various clients and I have not been informed of any problems. (Suppression Tr. 7.)
{¶ 36} The record clearly indicates that the court was aware of a possible conflict of interest in the defense representation and initiated an inquiry into whether such a possibility existed when it questioned each of the defendants. In the case of appellant, she waived the issue of multiple representation, not just for purposes of the suppression hearing, but for the defense of the case.
{¶ 37} The next point in the case when appellant raised the issue of her representation was during the trial, after the prosecution had completed approximately one-half of its case-in-chief. At that point, without the jury present, appellant sought new counsel on the basis of differences with counsel over trial strategy, to-wit, that defense counsel was not asking questions which appellant thought should have been asked and counsel had yet to offer any witnesses on appellant's behalf. The court, recognizing its duty to inquire about the possibility of a conflict of interest due to the objection raised by the appellant at a sidebar conference, took part in the following exchange:
 {¶ 38} MS. WEST: I want new counsel, because questions that I wanted asked and I want to know answers to is not being asked. I was in the case in New York, and I heard a totally different thing than I heard today from another police officer. So I'd like to have my lawyer that's in the case in New York come out here, because something is going on. They talking about we conspired. They're conspiring to me.
{¶ 39} THE COURT: Who is "they"?
 {¶ 40} MS. WEST: The officers, Cheektowaga and Westlake. They keep —
 {¶ 41} THE COURT: You're referring to the police officers in Cheektowaga and Westlake?
 {¶ 42} MS. WEST: I'm talking about the police officers. I have a civil suit pending in New York, because I had a family court case out there where I was arrested and my children was involved. They were tooken (sic) away from me and everything. That case was thrown out.
 {¶ 43} The officer took the stand and said there wasn't no videotape. Another officer came in here and said he has videotape of people pushing stuff into the bags.
 {¶ 44} Like I said, I have two small children and I do have a business. I'm not going to watch somebody sit up here and, you know, talk people into believing something I didn't do. Why should I stand by and watch? I'm asking questions. I got pages and pages full of them I have not heard no answer to. I got to get an answer. Where is my witnesses? I don't have no witnesses coming in here.
 {¶ 45} THE COURT: Okay. Well, let me tell you something. It's not your chance to present your case yet. The State is still presenting their case.
{¶ 46} MS. WEST: Well, I don't —
 {¶ 47} THE COURT: Don't interrupt me. I didn't interrupt you.
{¶ 48} MS. WEST: Okay. I'm sorry.
 {¶ 49} THE COURT: Your case is not to be presented until after the State has rested. At that time, you can present your witnesses. The issue that you are raising is that you think your lawyer is being ineffective. It's referred to as ineffective assistance of counsel. That's what you're raising.
 {¶ 50} You can raise that issue, but I'm not going to grant your request for you to get a lawyer when we are in our third day of trial. We are at the end of the third day. Mr. Gedos is licensed to practice in Ohio. You have retained him. In my experience, I have seen nothing on the record that indicated ineffective assistance of counsel.
 {¶ 51} Now, you want to ask questions. If Mr. Gedos doesn't want to ask them, that's his decision. That's his decision as your counsel, who you have retained. Now, if you think he's ineffective, on appeal you can raise the issue of ineffective assistance of counsel.
 {¶ 52} MS. WEST: After what? After I go to jail?
 {¶ 53} THE COURT: After the case is over and if you are found guilty or you're convicted, you can raise that issue on appeal. But you can't come in here and raise this issue at 4:20 on the third day of trial that you want a new lawyer.
 {¶ 54} MS. WEST: I didn't even know about this trial. I didn't know I was coming for trial.
 {¶ 55} THE COURT: Ma'am, we did a motion to suppress and had a hearing on this over a month ago. At that time, I advised you of the potential conflict of interest. You all knew about that interest. You all waived that interest. You all yourselves retained Mr. Gedos.
 {¶ 56} MS. WEST: Not me. You asked me and I said, "For this hearing, yes, and that is on the record. I said, For this hearing."
{¶ 57} THE COURT: Well —
 {¶ 58} MS. WEST: Because I was assuming everybody was going to get their own lawyer.
 {¶ 59} THE COURT: No one ever — Mr. Gedos was there for your arraignment, where you could have gotten a new lawyer. Mr. Gedos was there when —
{¶ 60} MS. WEST: He wasn't there.
 {¶ 61} THE COURT: It's on the record. He was there and you retained him as your lawyer. We've had numerous pretrials on the case — they're documents on the record — where Mr. Gedos appeared on your behalf. So the motion is denied. (Tr. 588-593.)
{¶ 62} This limited inquiry does not indicate the possibility of a conflict of interest. See Cuyler v. Sullivan (1980), 446 U.S. 335, 356,100 S.Ct. 1708, 1722, 64 L.Ed.2d 333, 351-352, fn. 3 (A possibility of a conflict exists if the "interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties."); accordState v. Gillard (1997), 78 Ohio St.3d 548, 552, citing State v. Dillon
(1995), 74 Ohio St.3d 166, 168. Appellant's chief complaint with her retained defense counsel centered on the manner in which counsel was conducting her defense, specifically, not asking questions which appellant thought were needed and not having offered any witnesses on her behalf up to that point in the trial. The court explained that she would have an opportunity to present witnesses after the state had rested, during the defense case-in-chief. Neither of these alleged grounds, the type of questions or the presentation of witnesses, disclosed a possibility that defense counsel would be placed under inconsistent duties toward his clients should the multiple representation continue. The common defense strategy, that the co-defendants were innocent of the charges, never wavered. The defense of one co-defendant was never at odds with the defense of another co-defendant. Accordingly, the trial court did not err in denying the motion to obtain new counsel.
{¶ 63} The first assignment of error is overruled.
{¶ 64} The second assignment of error provides:
 {¶ 65} II. THE TRIAL COURT'S PERMITTING EVIDENCE TO BE INTRODUCED OF APPELLANT'S ARREST IN ANOTHER STATE VIOLATED EVID.R. 404(B).
{¶ 66} The arrest to which this assignment refers is the evidence supplied by Lieutenant Leahy concerning the arrest of this group of co-defendants in Cheektowaga, New York, for similar thefts involving large volumes of GAP clothing returns using numerous altered receipts. This offered evidence also detailed the perpetrators use of commotion and distraction while in the store to aid their scheme of pressuring the sales staff to mistakenly provide the cash returns while other perpetrators effected acts of shoplifting.
{¶ 67} Evid.R. 404(B) provides:
 {¶ 68} Rule 404. Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes.
{¶ 69} * * *
 {¶ 70} (B) Other crimes, wrongs or acts. Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
{¶ 71} Evidence of "other acts" is admissible if,
 {¶ 72} * * * there is substantial proof that the alleged similar act was committed by defendant. State v. Carter (1971), 26 Ohio St.2d 79, 55 O.O.2d 130, 269 N.E.2d 115, paragraph two of the syllabus, and if the evidence also tends to prove identity, scheme, motive or system. (Footnote omitted.)
{¶ 73} State v. Broom (1988), 40 Ohio St.3d 277, 282-283,1988 Ohio LEXIS 463 at 14-15.
{¶ 74} The facts surrounding the Cheektowaga arrest, which were committed by appellant and her group and were remarkably similar to the offenses committed in Westlake, was admissible under Evid.R. 404(B) for the limited purpose of demonstrating appellant's knowledge that she was dealing with stolen merchandise and altered receipts, and further demonstrating the group's plan in committing the offenses in Westlake.
{¶ 75} Appellant closes this assignment by arguing that this New York evidence should still be excluded under Evid.R. 403(A). Appellant's argument with respect to this issue consists of one conclusory sentence, that the New York evidence was "so prejudicial it outweighed any probative value it may have." Appellant's brief at 12.
{¶ 76} It cannot be questioned that any evidence which points to the guilt of a defendant in a criminal case is prejudicial to the defense. For our purposes, the question is whether that evidence is "unduly" prejudicial. In deciding whether the admission of other acts evidence was unduly prejudicial in this case, we are guided by the following balancing test:
 {¶ 77} Chief Justice Rehnquist, writing for a unanimous court in Huddleston v. United States
(1988), 485 U.S. ___, 99 L.Ed.2d 771, 108 S.Ct. 1496, held that the trial court's determination of whether admission of other acts is unduly prejudicial turns upon consideration of whether the evidence is offered for a proper purpose (Fed.R.Evid. 404[b]), whether it is relevant (Fed.R.Evid. 402) (could the jury reasonably conclude that the other act occurred and that the defendant was the actor), whether the probative value of evidence of the other acts substantially outweighs the potential for unfair prejudice (Fed.R.Evid. 403), and whether the jury, upon request, is instructed that the evidence is to be considered only for the proper purpose for which it was admitted (Fed.R.Evid. 105). The standard of proof in federal civil and criminal cases for admission of "other acts" is merely one of sufficiency of evidence to support a finding by the jury that the defendant committed the other act.
{¶ 78} State v. Broom, supra, 40 Ohio St.3d at 283, Fn. 1.
{¶ 79} In the present case, the other acts evidence was offered for a proper purpose under Evid.R. 404(B), to-wit, to show knowledge and plan. That evidence was relevant under Evid.R. 402 in that the jury could reasonably conclude that the New York offense was committed by appellant and the group of co-defendants. The jury was given a proper, limited purpose instruction with regard to the consideration of this other acts evidence. Finally, we conclude that this evidence was not unduly prejudicial in that its probative value was not outweighed by the potential for unfair prejudice to appellant given the wealth of evidence supporting guilt in this case.
{¶ 80} The second assignment of error is overruled.
{¶ 81} The third, and final, assignment of error provides:
 {¶ 82} III. APPELLANT'S CONVICTION IS NOT SUPPORTED BY SUFFICIENT EVIDENCE.
{¶ 83} In this assignment, appellant argues that the evidence was insufficient to sustain the conviction for the offense of receiving stolen property in violation of R.C. 2913.51.
{¶ 84} The standard of review for a criminal case alleging insufficiency of the evidence was recently stated by this court inState v. Munz (Feb. 21, 2002), Cuyahoga App. No. 79576, unreported, 2002 Ohio App. LEXIS 701 at 9-11, as follows:
 {¶ 85} With respect to sufficiency of the evidence, `sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 Ohio Op. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 86} State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546.
 {¶ 87} The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia (1979), 443 U.S. 307, 61 L.Ed.2d 560, 99 S.Ct. 2781, at the syllabus.
{¶ 88} This court has stated as follows:
 {¶ 89} A sufficiency claim raises a narrow question of law that we review de novo. State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546. We review the record to determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Stallings (2000), 89 Ohio St.3d 280, 289, 731 N.E.2d 159, 171 (quoting Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573). As the question of sufficiency of the evidence presents a question of law, it does not allow the reviewing court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. Rep. 215, 485 N.E.2d 717, 720.
 {¶ 90} State v. Williams, 2001 Ohio App. LEXIS 5418 at 10 (Dec. 6, 2001), Cuyahoga App. No. 78932, unreported.
{¶ 91} R.C. 2913.51 defines the offense of receiving stolen property:
{¶ 92} 2913.51 Receiving stolen property.
 {¶ 93} (A) No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense.
 {¶ 94} (B) It is not a defense to a charge of receiving stolen property in violation of this section that the property was obtained by means other than through the commission of a theft offense if the property was explicitly represented to the accused person as being obtained through the commission of a theft offense.
 {¶ 95} (C) Whoever violates this section is guilty of receiving stolen property. Except as otherwise provided in this division, receiving stolen property is a misdemeanor of the first degree. If the value of the property involved is five hundred dollars or more and is less than five thousand dollars, if the property involved is any of the property listed in section 2913.71 of the Revised Code, receiving stolen property is a felony of the fifth degree. If the property involved is a motor vehicle, as defined in section 4501.01 of the Revised Code, if the property involved is a dangerous drug, as defined in section 4729.01
of the Revised Code, if the value of the property involved is five thousand dollars or more and is less than one hundred thousand dollars, or if the property involved is a firearm or dangerous ordnance, as defined in section 2923.11 of the Revised Code, receiving stolen property is a felony of the fourth degree. If the value of the property involved is one hundred thousand dollars or more, receiving stolen property is a felony of the third degree.
{¶ 96} Appellant argues that there was no evidence that she stole any of the clothes found in the two cars. In the alternative, appellant argues that there was no evidence that more than $5,000 in clothing was stolen, which would make the offense a fifth-degree felony, not a fourth-degree felony for which she was tried and convicted (where the value of the stolen property is $5,000 or more and is less than $100,000, receiving stolen property is a fifth-degree felony; see R.C.2913.51[C]).
{¶ 97} Absent an admission by a defendant, whether there was reasonable cause for a defendant to know if an item was stolen can only be shown by circumstantial evidence. See State v. Hankerson (1982),70 Ohio St.2d 87, 92. Factors to be considered in determining whether reasonable minds could conclude whether a defendant knew or should have known property has been stolen include:
 {¶ 98} (a) the defendant's unexplained possession of the merchandise, (b) the nature of the merchandise, (c) the frequency with which such merchandise is stolen, (d) the nature of the defendant's commercial activities, and (e) the relatively limited time between the theft and the recovery of the merchandise.
{¶ 99} State v. Davis (Cuyahoga, 1988), 49 Ohio App.3d 109, 112, quoting State v. Brooks (Feb. 27, 1986), Cuyahoga App. No. 50384, unreported, 1986 Ohio App. LEXIS 5735.
{¶ 100} Viewing the evidence in a light most favorable to the state, there was sufficient evidence that appellant received, retained or disposed of the clothing and that she had, at the least, reasonable cause to believe that the clothing had been stolen. When questioned by the police, appellant led police to believe that she had taken a public bus to the GAP store, yet it was later discovered that she had driven to the store in her own car, the Pontiac which was subsequently impounded and inventoried and found to have a great quantity of new clothing therein. This misleading act was replicated with regard to the other car used in the common scheme, the Lincoln Continental, in which a large quantity of clothing was discovered. This failure to tell the police of her car, or the co-defendant's Lincoln Continental, raises the reasonable inference that appellant either knew, or had reasonable cause to believe, that the evidence in her car, and in the Lincoln, was stolen and she did not want to lead the police to any of this evidence. Appellant, like the other co-defendants at the trial, claimed to be unemployed, yet, in addition to the large amounts of new clothing found in her car, she had over $800 in cash on her person. This further reinforces the inference that the large amount of new clothing found in her car, and in the Lincoln Continental, was stolen. The appellant, as did her co-defendants, misidentified herself to police and used a number of aliases in her dealing with the store. Appellant had in her possession a large number of receipts, many of which had shown signs of having been altered, which would permit an item to be improperly returned more than once. This places in doubt the legitimacy of the returns using these altered receipts and reinforces the inference that the clothing found in her car was part of a criminal enterprise.
{¶ 101} As for the argument that the monetary value of the stolen property did not exceed $5,000, the fact that appellant had return receipts which exceeded purchase receipts by $357 or that the groups' return receipts exceeded receipts for purchases by approximately $4,100 is not dispositive. If the value of the return receipts exceeded the value of the purchase receipts, then the value of any of the clothing remaining in the groups' possession remains unaccounted for. It is this approximately $9,000 worth of unaccounted for clothing found in the two cars of the common criminal enterprise which formed the basis for the application of receiving stolen property as a fourth-degree felony.
{¶ 102} The third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, A.J., and MICHAEL J. CORRIGAN, J., CONCUR.
[1] During the trial, Leonard Burnett, testifying on behalf of the defense, stated that: (1) he, Amber Burnett and Alphonso Burnett are siblings; (2) Darlene Delraye is his mother; and, (3) Roderick Burnett is his cousin. See Tr. 950.
[2] While at the police station being booked, the defendants were loud and generally uncooperative. Amber Burnett was the most combative, screaming and then breaking the glass of the window on her cell door after repeatedly hitting it with her shoe, and then kicking the officer who then came to take her shoes from her.