OPINION
{¶ 1} Defendant-appellant Samuel Hayes appeals from his conviction and sentence for Aggravated Robbery, with a firearm specification. Hayes contends that the trial court committed plain error when it permitted, without objection, clothing to be received in evidence accompanied by police property tags containing inscriptions reflecting that the clothing, which had been retrieved from Hayes' residence, was clothing worn during the robbery. Hayes also contends that the trial court erred when it permitted the State to play a videotape of the robbery a second time for the jury.
 {¶ 2} We conclude that the admission of the clothing in evidence together with the property tags did not constitute plain error, and that the trial court did not abuse its discretion when it permitted the videotape of the robbery to be played a second time for the jury. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} One Friday afternoon in February, 2002, two men entered the Dayton Postal Employees Credit Union, and robbed it. One of the tellers recognized the two men as having been at the credit union earlier in the week, on Tuesday.
 {¶ 4} A bank video surveillance camera captured the events on both days on videotape. The Tuesday videotape showed Hayes entering the bank with another person, with no particular business to attend to. A teller testified that when Hayes was asked if he needed assistance, he asked for a person who did not work there, and then left. On this occasion, Hayes was wearing a red FuBu t-shirt, a New York Yankees cap, and a pair of specially designed shoes. These items were found in Hayes' apartment during a search, to which Hayes consented. Hayes admitted that he was at the credit union on Tuesday, and that he was one of the men shown on the Tuesday videotape. Hayes denied, however, that he was at the credit union on Friday, when the robbery occurred.
 {¶ 5} The State presented evidence that on the Friday of the robbery, Hayes approached the window where Jerry Thomas was working, pointed a gun at Thomas, and said, "This is a hold-up and I'm not playin'." Hayes' accomplice shouted, "She pressed the button," referring to Opal Wells, a teller, who responded, "No, I didn't." Hayes then turned the gun toward Wells, who dove for the floor in fear for her life. Hayes demanded that Wells move where he could see her, and instructed Pamela Gates, another teller, to open her drawer. Hayes's accomplice collected money, and the two men fled with approximately $2,002.
 {¶ 6} The Friday videotape is recorded in such a way that when it is played back at normal speed, events happen much more quickly than in reality. The videotape depicts the robbery occurring, and is consistent with the testimony of the witnesses. In the videotape, the man later identified as Hayes was wearing gold-rimmed glasses, sweat pants, and a black leather jacket. Items identical to these in appearance were recovered from Hayes's apartment.
 {¶ 7} The police took statements, reviewed the two videotapes, and put out a broadcast for the two suspects. A tracking dog tracked the suspects between two buildings, toward Wayne Avenue, but then lost the track. A witness from a smoke shop observed two black males running across Wayne Avenue, and getting into a grey Cadillac with an old-style Ohio license plate. A witness from the Hughes Supply Co. saw two black males running across Wayne Avenue and getting into a grey Cadillac, as well. Opal Wells and a customer, James Ratliff, identified Hayes from a photo spread as being one of the robbery suspects.
 {¶ 8} The videotape of the robbery was shown on the news that evening. A tip from Crime Stoppers was received that the robber was "Sammy Hayes." The tip reported that Hayes would be picking up his girlfriend at the Breezeway bar at about 2:15 a.m. in a grey Cadillac. Hayes approached the entrance of the Breezeway between 2:00 and 2:30 a.m., in a grey Cadillac, and was immediately arrested. When he was arrested, Hayes was a wearing a pair of Nike tennis shoes, matching the design of the shoes worn in the robbery, and Hayes was carrying $2,024 in cash. A bank wrapper initialed and dated by Opal Wells was found in Hayes's apartment.
 {¶ 9} Following a jury trial, Hayes was found guilty of Aggravated Robbery, with a firearm specification. A judgment of conviction was entered and Hayes was sentenced accordingly. From his conviction and sentence, Hayes appeals.
 II {¶ 10} Hayes's First Assignment of Error is as follows:
 {¶ 11} "It was plain error and the court abused its discretion in admitting Exhibit 21 with the notation `clothing worn in Bank Robbery at Postal Emp Credit Union'; and it was plain error and the court abused its discretion in admitting Exhibit 22 with the notation `property worn during agg robbery of Dayton Postal Credit Union.'"
 {¶ 12} Certain items seized from Hayes's apartment, consisting of a pair of non-prescription glasses, a "Fubu" t-shirt, and other items of clothing, were admitted in evidence as Exhibit 21. Except for the glasses, these items of clothing are in a brown paper bag to which is attached a label, upon which a State's Exhibit number is affixed. The front and back of this property tag, being tag number 0238927, is appended to this opinion. One side identifies the "complainant" as the Dayton Postal Credit Union, and the defendant as Samuel Hayes. It indicates where the property was recovered, being the address listed for Hayes. It lists the recovered property. It bears the name of the officer who recovered the evidence, William M. Myers. On the other side, along with other information, there is the printed legend: "PRINT OR TYPE (Do Not Write) A SHORT STORY HOW PROPERTY CAME INTO YOUR POSSESSION AND/OR DESCRIBE, BRIEFLY, THE OFFENSE:"
 {¶ 13} Below this are seven printed lines. On the first two of these lines the following appears, in handwriting: "CLOTHING WORN IN BANK ROBBERY AT POSTAL EMP. CREDIT UNION."
 {¶ 14} When Hayes was arrested, he was wearing a New York Yankees baseball hat and a pair of size 12 Nike shoes, blue and white in color. These were admitted in evidence as State's Exhibit 22. Again, these items of clothing are in a brown paper bag, to which a property tag has been attached. This property tag is number 0238935. The State's exhibit number has been affixed to one side. This property tag is also appended to this opinion. This property tag is the identical printed form, and contains blank lines on one side for the "short story how property came into your possession," just like the other property tag. The first of these printed lines is left blank, but the second and third contain the following handwritten text: "PROPERTY WORN DURING AGG ROBBERY AT DAYTON POSTAL CREDIT UNION."
 {¶ 15} As Hayes acknowledges, no objection was made to these property tags, which were presumably attached to exhibits 21 and exhibits 22 when those exhibits went back into the jury room during deliberations. During the trial, no notice seems to have been taken of these handwritten notations on the property tags, and it may be that neither defense counsel, the prosecuting attorney, nor the trial court was even aware of these notations.
 {¶ 16} Hayes contends that allowing the property tags to go back to the jury room constituted plain error, arguing that: "The notations could be understood by a member of the jury to be a direct instruction to find that the clothes were worn during the robbery."
 {¶ 17} Notice of plain error is to be taken with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Pumpelly (1991), 77 Ohio App.3d 470,475, 602 N.E.2d 714, 717. The test for noticing plain error is whether or not the outcome of the trial would clearly have been otherwise except for the error. State v. Stallings, 89 Ohio St.3d 280, 285, 2000-Ohio-164,731 N.E.2d 159. Applying these tests, we find no plain error. The notations on the property tags plainly reflect the understanding of the person filling out each tag concerning the evidentiary significance of the items. The police obviously believed that at least some of these items of clothing were worn by Hayes during the robbery, and this could have come as no possible surprise to the jury. Hayes, who testified in his defense, denied that he was at the credit union on the day of the robbery. It was clearly for the jury to determine this fact, and we find it unlikely, in the extreme, that the presence of these handwritten notations on the property tags, to which no reference was made during the trial, would have caused the jury to believe that it could, or should, defer to the opinion of the police officer filling out the tags in determining whether Hayes was the perpetrator, or, in other words, whether these articles of clothing were worn by Hayes during the robbery.
 {¶ 18} In fact, as the State points out, if the notations on the property tags were noticed by the jury, the jury would necessarily realize that whoever filled out the tags had not been accurate. At least some of the clothing comprising these exhibits was clearly not worn during the robbery, but was worn by Hayes when he visited the credit union the preceding Tuesday, which he admitted having done. Thus, the judgment of the police officer filling out the property tags was demonstrably fallible, thereby further reducing the likelihood that the jury would have misunderstood that it was obliged to subordinate its judgment to the judgment of whoever filled out the tags.
 {¶ 19} We are convinced that the jury, if it noticed the notations on the property tags at all, would understand that they merely reflected an obviously imperfect attempt, on the part of the person filling out the tags, to indicate the evidentiary significance of the items being tagged. We are convinced that the jury would not have relied upon these notations in determining the dispositive factual issue in the case — whether Hayes was the perpetrator of the robbery. Accordingly, the result of the trial would not clearly have been otherwise had the property tags not accompanied Exhibits 21 and 22, and their having done so has not caused a manifest miscarriage of justice.
 {¶ 20} Hayes' First Assignment of Error is overruled.
 III {¶ 21} Hayes's Second Assignment of Error is as follows:
 {¶ 22} "It was plain error and the court abused its discretion by allowing Exhibit 14 to be shown to the jury twice thereby giving the exhibit undue weight."
 {¶ 23} Although Hayes asserts that the error of which he complains in his Second Assignment of Error constitutes plain error, his trial counsel did object to the showing of Exhibit 14, the videotape of the actual robbery, a second time to the jury. Consequently, we review this assignment of error under our ordinary standard of review, not under the plain error standard of review.
 {¶ 24} We have reviewed Exhibit 14. It was recorded in such a way that when the tape is played at normal speed, in an ordinary videocassette recorder, the action takes place at many times normal speed. The entire robbery takes place in but a few seconds, when the tape is played at normal speed.
 {¶ 25} The tape had first been played for the jury on the first day of trial. At that time, it had not been possible to play the tape at other than normal speed, either because the proper equipment was not available, or because persons with the requisite technical skill were not available.
 {¶ 26} On the second day of trial, still during the State's case-in-chief, the technical capability apparently existed to show the tape at a slower speed. In making its ruling that the tape could be shown to the jury a second time, at a slower speed, the trial court ruled as follows:
 {¶ 27} "JUDGE FOLEY: All right. Counsel, mem- — members of the Jury, it's been explained to me and — and — that this is the same tape that you saw day before yesterday. That tape apparently was shown at a — at a pretty rapid speed and I recall that the State's Counsel was — in order to make any points at all was required to stop it and — and freeze frames or — or something close to that.
 {¶ 28} "Because that may make the showing of the tape on Monday not — not very clear, I am going to permit it to be shown again at a speed that is more visible to you since — since that may be of some benefit to you. By doing this I'm — I'm not indicating that this particular tape Exhibit should be given any extra emphasis in the case just because I permitted it to be shown twice.
 {¶ 29} "Like all other evidence, you will consider this tape and you will decide the signi- — significance of it and how much weight to give to it. Just don't form the opinion that because I'm allowing it to be shown again to you that I am somehow trying to give some extra value or significance to it. You're the ones who will decide what weight to give to any particular Exhibit or the testimony in the case. So . . .
 {¶ 30} "MR. CHRISTON [representing Hayes]: Your Honor?
 {¶ 31} "JUDGE FOLEY: Yes?
 {¶ 32} "MR. CHRISTON: For the record, may we — we, uh . . . object to this shown at a significantly slower speed. Uh . . . at this time, we object, Your Honor.
 {¶ 33} "JUDGE FOLEY: Okay, I understand that, Mr. Christon, and having given consideration to that and tr- — and protecting the balance, the interests off here [sic], it's my decision that the tape can be shown again. And I've indicated to the Jury why I'm doing that and I'm not trying to over emphasize that evidence any more than any other evidence in the case. The evaluation of evidence is up to the Jury.
 {¶ 34} "Objection's overruled. Go ahead."
 {¶ 35} Hayes argues that the trial court abused its discretion by showing the videotape twice, and that the effect of showing of the videotape twice, "together with the court's comments, was to emphasize that exhibit over and above the other items of evidence in the case. An individual juror could easily have felt pressure to interpret the tape in a way which was prejudicial to Mr. Hayes." Hayes argues that: "A juror in this trial could have reasonably felt considerable pressure to agree with the State's interpretation of the videotape. Showing the videotape twice, together with the discussions surrounding the showing of the tape, was unfair to the defendant and interfered with his right to a fair trial."
 {¶ 36} To begin with, the trial court's remarks appear to have been intended to assure the jury that it should not give extra emphasis to the videotape, merely because it was being shown twice. This was commendable and appropriate.
 {¶ 37} The reason offered by the trial court for its ruling — that the first showing of the videotape had been at such an unnaturally high speed, so that a slower speed would be of more assistance to the jury — is, in our view, reasonable in itself. This, alone, was a good and sufficient reason to show the videotape a second time, at a slower speed, when it became technically feasible to do so.
 {¶ 38} Beyond that, the potential prejudice of presenting a piece of evidence to a jury more than once is that the repeated presentation of the evidence may give it undue weight, in the minds of the jury. The essential factual dispute in this case was whether Hayes was the perpetrator. The State presented evidence that he was the perpetrator; Hayes presented evidence that he was not. Under these circumstances, we find it hard to imagine any piece of evidence more critical to the jury's deliberation than the videotape of the robbery, showing the perpetrator. Any reasonable juror would want to look at that tape, repeatedly, if necessary, until the juror was satisfied either: (1) that Hayes was the perpetrator; (2) that Hayes was not the perpetrator; or (3) that it was not going to be possible, just from looking at the videotape, to determine whether Hayes was the perpetrator.
 {¶ 39} Under these circumstances, the fact that the videotape was played a second time, at a slower speed, did not give undue weight to this piece of evidence. Intrinsically, the videotape was entitled to great weight.
 {¶ 40} In his brief, Hayes implies that the second playing of the videotape, at a slower speed, put pressure on the jurors to agree with the State's interpretation of the tape. We presume the contrary. The more opportunity a juror would have to review the videotape, the less that juror would be inclined to substitute anyone else's interpretation of the events depicted on the tape for the juror's own interpretation, based upon his own observation. The more opportunity the jury had to view the videotape, the more the advocates, on both sides, were reduced to arguing, "who are you going to believe, me, or your own eyes?"
 {¶ 41} Hayes' Second Assignment of Error is overruled.
 IV {¶ 42} Both of Hayes's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Grady and Young, JJ., concur.