JOURNAL ENTRY AND OPINION
{¶ 1} A jury found defendant Jack Kelly guilty of two counts of abduction, two counts of felonious assault, and one count each of intimidation and assault. The jury found him not guilty of a single count of disrupting public service. In this appeal, he claims that the state violated his right to a speedy trial, that the court erroneously refused to permit him access to grand jury minutes, that the court improperly allowed the introduction of inadmissible hearsay, and that the verdicts were supported by neither the sufficiency nor the weight of the evidence.
 I {¶ 2} The charges stemmed from a series of altercations that Kelly had with the victim — his girlfriend. At trial, the victim recanted her statements to the police and denied that Kelly had committed any transgressions against her. In fact, she testified that she repeatedly approached the state and the court to drop the charges against Kelly because she had fabricated them.
 {¶ 3} Believing her recantations to be motivated by fear rather than conscience, the state relied on statements she made to law enforcement officers at the time she filed her complaints, as well as the testimony of those police officers who individually processed those complaints.
 {¶ 4} The first time period for the charges occurred in September 2003 when the victim and Kelly began fighting while attending a party. At trial, the victim denied that Kelly "put his hands" on her at the party and thereafter that evening, but admitted that she told the police otherwise. She said that they had an argument because she wanted to leave a party they were attending but he did not. She said that she drove off with Kelly in the passenger seat and dropped him off at home. The state contradicted this testimony with a written statement the victim gave to the police following the incident. In that statement, she told the police that she wanted to leave the party, but Kelly did not. When she entered her car and tried to drive away, Kelly reached into the car and took the keys from the ignition. He then pulled her out of the car and grabbed, slapped and knocked her around. He threw her onto the pavement and slammed her against the passenger side door of the car, eventually putting her into the passenger seat. He drove away, ignoring her pleas to let her out. Eventually, he drove to his home where he exited the car. The victim then took the car and drove to a girlfriend's house, where she was persuaded to file a police report.
 {¶ 5} When the victim made her police report, the police took photographs of her. Those photographs showed the victim with a swollen face, bloody nose and a burn mark on her lip. The victim testified at trial that her swollen face and bloody nose were the result of crying. She said the burn mark came from Kelly's cigar which she "ran into."
 {¶ 6} When asked by the state about specific instances where Kelly had struck her with a cell phone or beat her with a wire hanger, the victim replied, "I don't recall." The state then confronted her with another written statement in which she made rather specific allegations to that effect. The victim conceded that she gave a statement in which she alleged that in March 2004, Kelly hit her in the face with a cell phone. As a result of this incident, she bore a scar on her face. She identified photographs depicting the scar, but insisted that she fabricated how she received the scar. She claimed that Kelly threw the phone against the wall in a fit of anger and that the phone ricocheted off the wall and struck her by accident.
 {¶ 7} The victim likewise conceded that she gave a statement in which she said, "one time in May [2003] after he found out I was out with a friend, he took a wire hanger and hit me several times on my right leg. I did not come forward due to him telling me if I went to the police he would drag my mother's name through the mud as well as my father's." Even after reading this statement in court, she denied recalling the incident. She then identified pictures of herself which showed the scar on her face and "light bruising on my leg." Even though she recalled a meeting with the prosecuting attorney where she was asked if the bruises on her leg were a result of being struck by the wire, she claimed not to recall how she answered.
 {¶ 8} The victim continued to insist, however, that she fabricated her allegations out of anger. She admitted not showing up for a previously scheduled trial because she thought her absence would lead to a dismissal of the charges against Kelly. She further admitted that she was afraid of Kelly because "when he gets angry he has a tendency to get violent." She read from her statement that she "definitely" believed that Kelly was using his threats against her family to intimidate her not to testify. In fact, she said in her statement that she had a "mental breakdown" as a result of the pressure Kelly placed on her and required hospitalization. Despite these traumas, she continued to see Kelly in violation of a court order forbidding the two from being together.
 {¶ 9} The state then offered the testimony of three police officers who were involved in taking statements from the victim. The officer who took the statement following the September 2003 incident recalled that the victim came into the station with a bloody nose, swollen eye and a burn mark on her lip. He identified photographs that he took of the victim, but said that her injuries were more significant than shown by the photographs. He described the victim's demeanor as typical for an assault victim, and that she was "a bit hysterical" and "very intent on pursuing charges." When the officer contacted Kelly about the victim's allegations, he denied being with the victim that night. Kelly told the officer that the victim had a chemical imbalance and "makes things up." The officer later confirmed that Kelly had been at the party that night.
 {¶ 10} A lieutenant recounted how he interviewed the victim four days after she made her initial report. Although her swelling had diminished, he could still see traces of it on her face, and he saw the burn mark on her lip. The lieutenant prepared a statement for the victim based on questions and answers made during their time together. He said that the victim signed the statement and he forwarded the case to the prosecuting attorney.
 {¶ 11} The lieutenant recounted how the charges were brought to trial, but that the victim did not appear to testify. When he located the victim, she told him that she did not receive a subpoena, so he personally handed her one and informed her that the court had ordered her presence. She told the lieutenant that she needed time to change clothes for court and would meet him there. She did not, however, appear for trial. The court's docket shows that the charges against Kelly were voluntarily dismissed by the state.
 {¶ 12} A few months later the parties appeared for a second trial. While waiting with the victim in a court hallway, the lieutenant spoke to the victim. As a result of that conversation, the lieutenant learned of the May and August incidents and further learned that the victim had been pressured by Kelly to drop the charges. This conversation prompted the second indictment with its additional charges.
 {¶ 13} A police detective testified that the victim came to him in August 2004, in the company of the police lieutenant, to make a report of abuse perpetrated by Kelly. The detective did not believe that the victim was scared to make the report, but rather had a determination to "get this off her chest" and "be done with the whole situation." The detective prepared a general report, and the victim signed a question/answer statement. The detective took photographs which depicted swelling and a mark on her face, and bruising on her legs. She told the detective that the mark on her face occurred when Kelly threw a cell phone at her, while the bruises on her leg were a result of being whipped by a wire coat hanger. He admitted to being surprised by the victim's recantation of charges because she had been so adamant at the time she gave him her statement.
 {¶ 14} On June 3, 2004, the grand jury returned a multi-count indictment against Kelly in CR-452680. Counts one and two of the indictment charged abduction, count three charged assault and count four charged disrupting public service. The state voluntarily dismissed this indictment on October 13, 2004, apparently as a result of the victim failing to appear to testify at trial. When the case was scheduled for retrial, the lieutenant learned from the victim that Kelly had perpetrated other, as yet charged, acts of violence. It then refiled the case as CR-455608, under a new indictment. The new indictment contained the previously filed charges and added as counts five and six charges of felonious assault which were alleged to have occurred on March 16, 2004 and May 9, 2004, respectively. Count seven charged intimidation.
 II {¶ 15} Kelly first complains that the court violated his right to a speedy trial by failing to bring him to trial within the statutorily-allotted time.
 {¶ 16} A person charged with a felony offense shall be brought to trial within 270 days after arrest. R.C.2945.71(C)(2). If the accused is held in jail in lieu of bail on the pending charge, each day of confinement shall be counted as three days. R.C. 2945.71(E). The speedy trial time may, however, be tolled for any number of reasons, including any motion made by the accused. See R.C. 2945.72(E).
 {¶ 17} Kelly concedes that he filed various motions which tolled the running of the speedy trial time. The state's time calculation, which Kelly does not dispute, affirmatively shows that these motions and other continuances requested by the defense tolled the time so there was no violation of the right to a speedy trial. We need not repeat these calculations as even Kelly admits they "speak for themselves."
 {¶ 18} Kelly goes on to suggest, however, that the state's "machinations" in the indicting and charging process must be taken into consideration in concluding that the delay in bringing him to trial is unjustified and unreasonable. We characterize this as a "suggestion" rather than an "argument" because Kelly does not separately argue it, nor does he cite to legal authority to support his proposition. See App.R. 12(A)(2). Alleged irregularities or abuse of the grand jury process is a markedly different legal argument than alleged speedy trial violations. Because they are not independently argued or supported by citation to applicable law, we choose to disregard them.
 III {¶ 19} The court denied Kelly's Crim.R. 29(A) motion for judgment of acquittal. He assigns this as error, claiming that the victim, as the only eyewitness to the crimes, recanted her allegations against Kelly and insisted that her prior statements were fabrications motivated by her anger. Absent substantive evidence from the victim, Kelly maintains that the state could not prove the elements of the offense through hearsay evidence related by police officers.
 {¶ 20} Some jurisdictions permit prior inconsistent statements of a witness in a criminal proceeding to be used as affirmative evidence of the facts to which such statements relate where the declarant is available or called as a witness at the trial, and is subject to cross-examination, and where the statement would be admissible if made by the witness while testifying. See Annotation, Use or Admissibility of Prior Inconsistent Statements of Witness as Substantive Evidence of Facts to Which They Relate in Criminal Case — Modern State Cases (1984), 30 A.L.R.4th 414. As stated in the annotation, "[t]he usual reasons given by such courts are that most of the lost protections in the use of out-of-court statements as substantive evidence are largely regained where the declarant is a witness and can be confronted and cross-examined, that the prior statements, of necessity, are made closer in time to the event in question when memories are fresher, and, moreover, the oath is not as strong a guaranty of truth as it may have been at one time." Id. at section 2a.
 {¶ 21} Ohio does not follow this rule. In State v. Dick
(1971), 27 Ohio St.2d 162, the first paragraph of the syllabus states, "[a]n extra-judicial, unsworn, signed statement of a witness which has been denied by the declarant under oath is not admissible as proof of the allegations contained therein."
 {¶ 22} When adopting the rule, the supreme court noted that two views presently existed:
 {¶ 23} "Under the generally accepted orthodox view, `. . . a previous statement of the witness, though admissible to impeach, is not evidence of the facts stated. . . . When used for that purpose, the statement is hearsay. Its value rests on the credit of the declarant, who was not under oath nor subject to cross-examination, when the statement was made.' McCormick on Evidence, 74, Section 39. See, also, 3A Wigmore on Evidence, Section 1018, and cases cited therein.
 {¶ 24} "Wigmore, on the other hand, takes the opposite view as follows:
 {¶ 25} "`(b) It does not follow, however, that prior self-contradictions, when admitted, are to be treated as having no affirmative testimonial value, and that any such credit is to be strictly denied them in the mind of the tribunal. The only ground for doing so would be the hearsay rule. But the theory of the hearsay rule is that an extrajudicial statement is rejected because it was made out of court by an absent person not subject to cross-examination. . . . Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former statement. The whole purpose of the hearsay rule has been already satisfied. Hence there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve. . . .' 3A Wigmore on Evidence, Section1018, at 996.
 {¶ 26} "This court has long adhered to the principle that `when taken by surprise by the adverse testimony of its own witness, . . . the state may interrogate such witness concerning his prior inconsistent . . . statement . . . for the purpose of refreshing the recollection of the witness, but not for thepurpose of offering substantive evidence against the accused.' (Emphasis supplied.) State v. Duffy (1938), 134 Ohio St. 16,17. See Hurley v. State (1888), 46 Ohio St. 320, 322; State v.Minneker (1971), 27 Ohio St. 2d 155.
 {¶ 27} "The fact that the appellant did not have the opportunity to cross-examine Daniels when the statement was made, nor during the second trial, is sufficient in itself to avoid any consideration of Wigmore's position." Dick,27 Ohio St.2d at 164-165 (emphasis sic.).
 {¶ 28} Consistent with Dick, the court permitted police officers to testify for the state as to the contents of statements made by the victim to them while investigating her complaints only for purposes of impeachment. The court cautioned the jury that "I'm instructing you not to consider that for the truth of whether those statements actually occurred but we're testing again the credibility of [the victim]." The court reiterated that it was permitting the statements for the specific purpose of examining the victim's credibility, not for "whether these events actually occurred * * *." In fact, the court denied admission of the statements consistent with Dick because "they are not substantive evidence. They're impeachable. They merely go as to impeach. They do not go in as evidence."
 {¶ 29} We presume that the jury follows cautionary instructions. See State v. Stallings, 89 Ohio St.3d 280, 286,2000-Ohio-164. The clarity and comprehensiveness of this cautionary instruction is not open to dispute. We have no basis for concluding that the jury disobeyed the court's instruction and considered the victim's police statements as substantive proof that the events described in the statements occurred.
 {¶ 30} The only substantive evidence apart from the victim's statements were photographs depicting her injuries. These were taken in September 2003 and August 2004, contemporaneously with her statements. The September 2003 photographs show the victim with a bloody nose and a burn mark just above her upper lip. The officer who took these photographs testified that he could see swelling on the left side of her face, although he admitted that "I think the injuries were worse than what's shown here." The detective who took the August 2004 photographs testified that the photographs showed swelling on the left side of the victim's face and multiple bruise marks on her legs. Like the other officer, the detective conceded that the victim's injuries "don't show up as well in the photographs as they did in person."
 {¶ 31} The photographs constitute independent proof of the two felonious assault and one assault counts. Thus, the jury could test the credibility of the victim's recantation by reference to the photographs. In other words, the jury had every right to consider the recantation as dubious in light of the demonstrated physical evidence of injury depicted in the photographs. A bloody nose, swelling and bruising were consistent with the kind of injury suffered as a result of an assault or felonious assault. The jury could find the victim's denial in light of this evidence to be unbelievable.
 {¶ 32} There is no independent or otherwise admissible proof, apart from the victim's statements, to prove the abduction and intimidation counts. Unlike the assault counts, the victim's recantation of events forming the basis of abduction and intimidation could not be tested independently by evidence which challenged her credibility. For the court to find sufficient evidence of these offenses such that it could deny a motion for judgment of acquittal under Crim.R. 29(A), it would have to consider her signed statements as providing substantive evidence. This is not only contrary to Dick, but contrary to the court's own evidentiary rulings and cautionary instruction to the jury. Moreover, any testimony by the law enforcement officers as to verbal statements made by the victim would be hearsay. In the event the court did not permit the law enforcement officers to testify to the victim's verbal statements, the jury heard nothing apart from what was contained in the written statements. Absent independent evidence apart from those written statements, there was simply no competent evidence to contradict the victim's trial testimony in which she completely denied being abducted or intimidated. We therefore vacate the convictions on two counts of abduction and one count of intimidation.
 {¶ 33} In the end, the application of the Dick rule may be of no moment in cases like this. In Crawford v. Washington
(2004), 541 U.S. 36, the United States Supreme Court dramatically changed existing precedent under the Confrontation Clause to hold that the Clause prohibits the introduction of "testimonial" hearsay statements against a criminal defendant unless the defendant is afforded an opportunity to cross-examine the declarant. In reaching this conclusion, the court effectively swept away its old regime of admitting hearsay statements under exceptions that were "firmly rooted" or were otherwise deemed to possess "particularized guarantees of trustworthiness." See Ohiov. Roberts (1980), 448 U.S. 56, 65-66. The court stated:
 {¶ 34} "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of `reliability.' Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." Id. at 61-62 (citations omitted).
 {¶ 35} The court specifically chose not to create a bright-line definition of the term "testimonial." However, as relevant to cases involving a victim's recantations, it held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Id. at 68.
 {¶ 36} The court recently provided a working test to distinguish testimonial from nontestimonial statements in the limited context of police interrogations. In Davis v.Washington (2006), 547 U.S. ___, 126 S.Ct. 2266, 2273-2274, the court held:
 {¶ 37} "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."
 {¶ 38} Signed police statements of the kind produced in this case are "testimonial" under the Davis test since they are made not with the intent of assisting the police to meet an ongoing "emergency" related to the offense (for example, a 9-1-1 emergency call to the police) but rather to compile evidence for later use at trial. Thus, when a victim of domestic violence recants her prior statement to the police, and there is no independent evidence to substantiate the abuse suffered by the victim, prosecution will be problematic, to say the least. So regardless of whether Dick is still considered viable precedent, Crawford and Davis will dictate the same outcome.
 IV {¶ 39} Kelly next argues that the inconsistencies in the victim's police statements and her recantations made her so unbelievable that the jury's verdict was against the manifest weight of the evidence.
 {¶ 40} When reviewing whether a conviction is supported by the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, [and] consider the credibility of witnesses. State v. Hancock,108 Ohio St.3d 57, 2006-Ohio-160, at ¶ 39, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. The relevant inquiry is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." Id.
 {¶ 41} Kelly correctly points to inconsistencies with the victim's trial testimony and her statements to the police. The state explained these inconsistencies by eliciting the testimony of police officers to show that victims of domestic violence often recant their testimony out of fear. And there could be no doubt that the victim feared Kelly. She testified in court that she was afraid of Kelly because "when he gets angry he has a tendency to get violent." The photographs admitted into evidence showed injuries consistent with the victim's initial complaints of abuse inflicted by Kelly. The physical evidence matched the victim's complaints to the police to the point where the jury could reasonably conclude that the victim's recantation was a canard designed to protect Kelly or herself . On this basis, we cannot find that this is the exceptional case requiring us to overturn the jury's assessment of the witness' credibility.State v. Martin (1983), 20 Ohio App.3d 172, 175.
 V {¶ 42} Kelly next complains that the court erred by refusing his request for production of the grand jury minutes for the second indictment. He claimed a need for the minutes as a way of divining the state's intent in bringing the additional charges contained in the second indictment.
 {¶ 43} "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." State v. Greer
(1981), 66 Ohio St.2d 139, paragraph two of the syllabus. Whether an accused has shown a particularized need for disclosure of grand jury testimony is a question of fact. Id., paragraph three of the syllabus. The decision of whether to release grand jury testimony is within the discretion of the trial court and will not be reversed absent an abuse of discretion. Id., paragraph one of the syllabus; State v. Coley (2001), 93 Ohio St.3d 253, 261.
 {¶ 44} The court did not abuse its discretion by denying Kelly's motion for production of the grand jury's minutes. Kelly believed that the second indictment had been brought about by pressure from family, friends, and law enforcement officers. He told the court that the only way he could assure himself of the "legality of the proceedings" would be to see the minutes to determine whether any undue influence had been exerted upon the victim.
 {¶ 45} This claimed right of access to the grand jury's minutes was so marginal as to be nothing more than a fishing expedition. Even if we were to assume that law enforcement officers "pressured" the victim to divulge additional acts perpetrated by Kelly, that pressure would be irrelevant to the question of whether an indictment properly issued on the basis of probable cause to believe that a criminal offense had been committed. The victim attested to the validity of her allegations by signing her statement. At that point, the officers were fully entitled to forward the case to the prosecuting attorney for submission to the grand jury. If Kelly truly believed that the police had pressured the victim into making additional complaints, he was fully able to cross-examine the police officers on that point at trial.
 {¶ 46} It is of no moment that the victim waited several months to inform the police of these acts. She had previously recanted her accusations and spent time in jail for disobeying a subpoena to appear at trial. Given her disinclination to implicate Kelly, it is hardly surprising that the victim might have held back from divulging additional incidents of violence. Indeed, the charge of intimidation clearly encompassed this point, for it alleged that Kelly had pressured the victim not to testify against him. Hence, the victim's reluctance to come forward with all allegations of abuse was consistent.
 {¶ 47} On its face, Kelly's motion for the grand jury's minutes set forth nothing to show even remotely that an unorthodox situation existed. We see nothing to show a particularized need for the grand jury minutes.
 VI {¶ 48} In conclusion, we find that there was insufficient evidence to support convictions on the two counts of abduction and one count of intimidation. The convictions on the remaining counts stand.
Judgment affirmed in part; vacated in part.
It is ordered that appellee and appellant share equally the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Corrigan, Judge Celebrezze, Jr., P.J., and Gallagher, J., Concur.